**In the Matter of the WELFARE OF M.A. and J.A.**

**No. C4-86-1617.**

Court of Appeals of Minnesota.

July 14, 1987.

Review Denied Sept. 18, 1987.

Richard C. Erickson, Cambridge, for appellant, Bonnie M.

Adam Ebenezer Bridge, Cambridge, for appellant, Perry A.

Scott A. Hersey, Isanti Co. Atty., Anne M. Taylor, Asst. Co. Atty., Cambridge, for respondent, Isanti County.

Neil Fagerstrom, Cambridge, for M.A. and J.A.

Heard, considered and decided by CRIPPEN, P.J., and LESLIE and STONE*, JJ.

## OPINION

CRIPPEN, Judge.

The mother and father appeal the trial court's termination of their parental rights under Minnesota Statutes § 260.2219(b)(4) and (5) (1986). We affirm the terminations.

## FACTS

M.A. and J.A. are the natural children of Bonnie M. and Perry A. J.A. was born in August 1978 and M.A. was born in September 1980.

In September 1982, the parents submitted a voluntary dependency petition due to their financial difficulties. The petition stated that the parents "wish to be relieved

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

of the children['s] care and custody because of general emotional pressures due to financial difficulties, the fact of the parent[s'] unemployment, plus the pressure of being on public assistance." The trial court found the children were dependent and granted the petition. *See* Minn.Stat. § 260.015, subd. 6(c) (1982) ("Dependent child" means a child whose parent for good cause desires to be relieved of the child's care and custody). At that time, J.A. was four years and one month old and M.A. was two years old.

Based on this adjudication, the county abandoned an earlier petition that alleged the children were dependent and neglected, based on physical injuries observed on the children and on the parents' temperament, drinking, waste of financial resources to purchase alcoholic beverages, and lack of cleanliness in the home.

Separate foster placement plans were prepared for the mother and father in October and November of 1982, because by that time they had separated. The foster placement plans contain essentially the same provisions. The mother's plan, as an example of the two plans, required the mother to take the following actions, among others, "to eliminate or correct the problems or conditions" leading to dependency:

a. Complete a psychological evaluation and follow any recommendations for counseling and treatment.

b. Complete a chemical dependency evaluation and follow any recommendations for chemical dependency treatment.

c. Attend all parenting classes recommended and available.

d. Cooperate with supportive counseling in regard to appropriate home care, clothing care, and food shopping techniques.

e. Obtain and maintain a job as appropriate to her ability.

f. Obtain and maintain adequate housing.

k. Receive money management counseling.

l. Cooperate with counseling in regard to her violent tendencies and all violence will cease completely.

n. Meet with the social worker on a regular basis, and if unable to make an appointment, she will give prior notice.

In contrast to the detailed demands placed on the parents, the welfare department agreed to a general obligation for:

supportive services by the social worker, the collection worker, the CD counselor, the public health nurse and/or homemaker and any other staff person as appropriate.

The foster placement plan is reproduced as an appendix to this opinion.

At the time of the dependency adjudication, the parents were receiving public assistance. The welfare agency agreed to provide money management counseling but did not agree to provide services aimed at relieving the parents' financial pressures, such as economic assistance, job skills training, or job application training.

In March of 1984, the welfare agency [1] suspended the mother's visitation rights, based on a report from the psychologist working with M.A. and J.A. The social worker recommended suspending visitation due to the children's reactions to the mother during visitation, i.e., the children hiding from the mother during visits, and name calling between the children and the mother. The child psychologist recommended suspending visitation "[b]ecause of [J.A.]'s severe behavioral reaction to contact with [the mother]." Specifically, the psychologist believed it was "not fair to put J.A. through the stress visits cause her, or to expect foster parents to regularly cope with extreme behavioral difficulties if we are not even sure [the mother] will comply with court-ordered plans that she must do to regain custody." The psychologist was also generally concerned with the utility of

---

**1.** On March 6, 1984, in an order based on a review of the court's initial disposition in the case, the trial court ordered: "Visitation with the mother is restricted to the conditions as set by Isanti County Family Services Department."

The record is unclear as to whether the court had before it and endorsed a proposal to terminate visitation contacts, or whether the court delegated to the public agency the complete discretion to make decisions on visitation rights.

parental visits "unless we are sure there is a reasonable likelihood that sufficient change has occurred in the mother so that her children might be returned." There has been no visitation between the mother and the children since February 1984.

Bonnie M. married Jim M. in July 1985. They resided together for some time before they were married. They have a daughter who was born April 26, 1984.

The father's visitation rights were suspended by an earlier court order, dated January 12, 1983. No findings accompany the order. Respondent Isanti County states that the order was based on the child psychologist's recommendations. The record contains the psychologist's letters recommending no visitation between the father and the children because of J.A.'s reports of sexual and physical abuse by the father. The first recommendation is found in a letter dated January 10, 1983. There have been no visits between the father and the children since the court first ordered his visitation rights suspended on January 12, 1983.

In April 1986, a staff person for respondent Isanti County Family Service and Welfare Department filed an amended petition for termination of the parents' rights, alleging two grounds for termination. First, the petition alleged each parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or specific conditions directly relating to the parent and child relationship, either of which are determined by the court to be permanently detrimental to the physical or mental health of the child. *See* Minn.Stat. § 260.221(b)(4) (1984). Second, the petition alleged that following a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination. *See id.* at (b)(5). Following a four day hearing, the court terminated the parents' parental rights. Bonnie M. appealed, and Perry A. filed a notice of review.

## ISSUES

1. Was termination of the father's parental rights supported by clear and convincing evidence?

2. Was termination of the mother's parental rights to J.A. supported by clear and convincing evidence?

3. Was termination of the mother's parental rights to M.A. supported by clear and convincing evidence?

## ANALYSIS

■ We have recently stated the law applicable to termination of parental rights, as established in legislation and decisions of the Minnesota Supreme Court. *See In Re Welfare of M.G. and C.G.,* 407 N.W.2d 118 (Minn.Ct.App.1987). There we detailed the general preference against termination of parental rights, the petitioner's burden of proving the allegations by clear and convincing evidence, and the need for grave and weighty reasons that support termination of parental rights. *Id.,* at 120. We noted that the best interests of the child is a "paramount consideration" in some termination of parental rights proceedings. *Id.* at 120 (quoting *In re Welfare of J.J.B.,* 390 N.W.2d 274, 279 (Minn. 1986)). We also stated the need for specific findings that conform to the statutory requirements. *Id.* at 121. In summarizing the applicable standard of review, we stated:

> Although "some deference" is given to the trial court's findings, the appellate courts " 'exercise great caution in termination proceedings,' " and will closely inquire into the sufficiency of the evidence to determine whether the evidence is clear and convincing." *In re Welfare of Clausen,* 289 N.W.2d 153, 156 (Minn. 1980) (quoting *In re Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978)).

*Id.*

This appeal involves four termination decisions, and each must be cautiously and separately reviewed. Based on ample evidence of unfitness, we affirm as to three of the termination decisions: We find sufficient evidence to support termination of the father's parental rights to both children

and the mother's parental rights to J.A., a child with severe emotional problems. The decision to terminate the mother's parental rights to M.A. is also sufficiently supported, although barely so, by the evidence showing the mother is unfit to assume parenting responsibilities. Although we affirm on the finding of unfitness, the petitioning agency furnished insufficient evidence that it made reasonable efforts to correct the conditions leading to dependency or to reunite parents and children, at least as to the mother's rights respecting M.A.

## I. *Termination of the Father's Parental Rights*

Perry A. claims the trial court erred in finding that he is "palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child." Minn.Stat. § 260.221(b)(4) (1986).

■ Our greatest concern on the trial court's finding of unfitness is the willingness to make that determination where there has been no contact between parent and child for over three years at the time the amended petition for termination was filed. In a termination proceeding, the court must examine conditions as they exist at, and up to, the time of the termination hearing. *In re Welfare of Clausen,* 289 N.W.2d 153, 156 (Minn.1980) (the relevant time period in determining whether the parent is presently able to assume responsibilities includes all times up to the time of the termination hearing).

■ In this case, however, there was sufficient evidence that the father is palpably unfit to parent his children due to specific conditions directly relating to the parent and child relationship that are permanently detrimental to the physical or mental health of the child. *See* Minn.Stat. § 260.221(b)(4). Since the 1982 dependency adjudication, the father has demonstrated a violent propensity. He threatened Bonnie

M. with a knife while in the courthouse on the date of their divorce. His mental health counseling ended due to his uncontrolled outbursts of anger. He has threatened to kill the social worker. In spite of court admonitions, he brought bullets and razor blades modified as weapons into the courtroom during the termination hearings.

When making its decision to terminate parental rights, the trial court also relied upon J.A.'s report of the father's sexual abuse of M.A. on December 2, 1982. On that date, the father was visiting the children at the Isanti County Welfare Department building. He accompanied J.A. and M.A. into the restroom. J.A. reported to the child psychologist that, while her father was changing M.A.'s diaper, he inserted his finger in M.A.'s vagina. The father's denial of any abuse on that occasion is inconsistent with the child's description of the act.

The evidence is sufficient to sustain the trial court's decision to terminate the father's parental rights, due to the serious risk of harm that the children face if placed in his care. Because we find ample evidence to sustain the trial court's decision to terminate parental rights under section 260.221(b)(4), we need not reach the issue of whether the court properly terminated parental rights for failure to correct the conditions leading to a determination of dependency or neglect. *See In re Welfare of R.M.M.,* 316 N.W.2d 538, 541 (Minn.1982) ("court need find the existence of only one of the statutory conditions in order to terminate parental rights"); Minn.Stat. § 260.221(b) (court may terminate the parent and child relationship if it finds that one or more of the statutory conditions exist).

## II. *Termination of the Mother's Parental Rights to J.A.*

■ The court terminated the parent and child relationship between the mother and J.A., based on its conclusion that she was palpably unfit and had failed to correct the conditions leading to the determination of dependency. *See* Minn.Stat. § 260.221(b)(4) and (b)(5) (1986).

Again, we are concerned with the court's finding that the mother is unfit, where there has been a long period of no visitation between parent and child. At the time of the hearing on the termination petition, the mother had not seen her children for over two years. While we note concerns over this part of the record, we nonetheless conclude that the mother is not able to parent this child, who has severe behavioral problems.

The record is replete with evidence of J.A.'s serious emotional and behavioral difficulties. The challenge of dealing with J.A.'s behavior problems is demonstrated by the fact that two foster home placements were unsuccessful due to J.A.'s unmanageable behavior. The child psychologist who worked with J.A. over a period of years described both foster homes as "excellent placements," with families who "sincerely and appropriately tried to work with [J.A.]." In June 1985, J.A. left the second foster home and moved into the Bush Children's Home, a group residential treatment program. J.A. was living there at the time of the termination hearing.

The child psychologist discussed J.A.'s relationship with her mother as it existed in 1984, two years after the dependency adjudication:

> It is obvious that visits with [the mother] are very stressful for [J.A.] and that her extreme emotional reactions are not a "normal" consequence of being in foster placement. They reflect instead her intense ambivalent feelings about her mother, and a very unusual and perhaps distorted mother-daughter relationship. Although a bond may be present, it does not appear to be a normal or growth-enhancing one for [J.A.] at this time."

Bonnie M. has remarried and is raising her child born of that marriage. While the record indicates that she is successful in parenting this child, she does not have the maturity and parenting skills necessary to deal with J.A.'s special needs. *See In re*

Welfare of D.D.K., 376 N.W.2d 717, 721 (Minn.Ct.App.1985).

Our decision to affirm termination of parental rights as to J.A. is also based on evidence indicating that J.A.'s serious emotional problems are related to her parents' prior abuse. On numerous occasions during their work together, J.A. told the child psychologist of physical abuse by her mother. Evidence that the child's special needs are related to the parent's past abuse should be considered when determining whether the parent is unfit. *See In re Welfare of T.M.D.*, 374 N.W.2d 206, 211 (Minn.Ct.App.1985), *pet. for rev. denied,* (Minn. Nov. 25, 1985); *In re Welfare of Udstuen,* 349 N.W.2d 300, 303–04 (Minn.Ct. App.1984). We conclude the evidence supports the trial court's decision to terminate the parent and child relationship between the mother and J.A., pursuant to section 260.221(b)(4).

### III. *Termination of Mother's Parental Rights to M.A.*

The court terminated the parent and child relationship between the mother and M.A., based on its conclusion that the parent was palpably unfit and that the mother had failed to correct the conditions leading to the determination of dependency. *See* Minn.Stat. § 260.221(b)(4) and (b)(5) (1986).

We note at the outset that the circumstances here, particularly the fact of a long separation between parent and child, undoubtedly require continued out of home placement whether or not there is a termination of parental rights. We recognize the need for permanency in children's lives. *See J.J.B.,* 390 N.W.2d at 279. However, there is no legal basis for granting termination solely because the child cannot be returned immediately to the parental home. *See In re Welfare of K.P.C.,* 366 N.W.2d 711, 715 (Minn.Ct.App.1985) (termination of parental rights reversed and remanded with instructions to continue out of home placement, provide regular visitation, and develop plan to reunite).[2]

---

2. We have reviewed the issue here with consideration of reversal accompanied by remand with instructions for (1) supervised visits with an aim to evaluate whether there is a salvagea-

ble relationship between the mother and child, (2) evaluation of a proposal for residential care for the mother and child, (3) evaluation of the present living circumstances of the mother and

## Palpably Unfit—Minn.Stat. § 260.221(b)(4)

The trial court found Bonnie M. has continued her violent temper, that her emotional disabilities impair her parenting ability, and that her second marriage to a man convicted of sexual abuse threatens the well-being of the children. The record demonstrates limited parenting capacity of the mother that the trial court could find to be irreversible. Based on our review of the record, we conclude there was adequate evidence for the trial court to find the mother is palpably unfit to parent M.A.

The Minnesota Supreme Court has stated its concern about the ability of the trial court to make a decision regarding parental fitness where there has been no contact between the parent and child for two and one-half years prior to the termination hearing. *See Clausen*, 289 N.W.2d at 156. This concern is especially significant here, based on the evidence of the mother's current circumstances, introduced through the testimony of a psychologist, therapist, family members and friends.

The mother's ability to parent was assessed by two professionals in the year preceding the termination hearing. As part of the court-ordered plan to regain visitation rights, the mother met with a therapist five times during April and May of 1985. The therapist testified at the termination hearing that, although the mother consistently indicated she was willing to work on parenting skills as part of the therapy, the therapist was not able to work on this topic with her for two reasons. First, the mother was not willing to discuss her own family history, which the therapist believed was a primary influence on her parenting ability. Second, the therapist felt that the children's absence from the home limited the opportunities to work on parenting skills because "there was really never any content that could be brought in."

A psychologist evaluated the mother in March 1986. The psychologist stated that his prognosis for the mother's ability to "adequately function" as a parent was "extremely guarded." The psychologist's comment, although accurately quoted by respondent, is an inaccurate characterization of the psychologist's report. On the other hand, the psychologist suggested a definite prescriptive program that consisted of the mother's participation in a supervised residential treatment center. The program staff would observe the mother interact with her children, evaluate her current parenting skills, and provide education on parenting skills. The psychologist's recommendation was given in a deposition prepared for the termination hearing, and there is no indication that the county or trial court had previously considered the benefits of a residential treatment program.

Family members and friends also testified regarding the mother's present parenting skills. Bonnie M.'s aunt, who raised Bonnie M. from the time she was an infant, testified that Bonnie M. has changed significantly since she met her present husband. She further testified that Bonnie M. and her present husband interact with their child appropriately and that they are doing an adequate job as parents. Two friends, who lived near the mother and frequently used her as a babysitter for their own children, testified they have always been satisfied with the care she has given.

Although the trial court based its decision, in part, on the mother's violent nature, there was no evidence that she committed violent acts in the four years preceding the termination hearing. The record does indicate the mother's antagonism and lack of cooperation with the social worker assigned to her case. The antagonism is confined to this one person and there is evidence that, in the year preceding the termination hearing, the mother was cooperative and maintained an appropriate relationship with two professionals.

■ The trial court also relied on the character of Bonnie M.'s present husband,

---

her spouse, and (4) continued efforts to obtain therapy services and financial services for the mother, until and unless cause for termination is redetermined. *See In re Welfare of K.P.C.*, 366 N.W.2d 711 (Minn.Ct.App.1985) (reversed and remanded with instructions).

Jim M., in finding parental unfitness. Jim M. was once convicted of third degree sexual conduct with a retarded in-law; he was given chemical dependency treatment but no sexual abuse treatment after being convicted. However, her marriage to one who has been guilty of misconduct does not per se establish unfitness, without examination of her circumstances, the depth of his problem, the evidence of his reform, and any cause for predicting he would be abusive to her or her children.

■ The evidence indicates Jim M. is employed as a truck driver and was employed in that position for three years at the time of trial. There is no evidence that he has been abusive to Bonnie M. or their child. Rather, the evidence indicates a healthy family relationship exists. Jim M.'s parole officer indicated that he has visited the family at their home in his professional role at least four times. His testimony as to the home and the family was, in all respects, positive. Specifically, he testified that the home was clean and in the three years he has supervised Jim M. he has not had reason to suspect marital discord or chemical abuse. He further testified that Jim M. is proud of their daughter and that Bonnie M. and Jim M. appear to be happy.

In sum, many of the facts recited by the trial court fail to justify a finding that Bonnie M.'s unfitness as to M.A. has been clearly established. We appreciate the danger of letting this particular termination decision rest on assumptions, speculation, or the demonstrated reasons to make three other termination decisions. More particularly, the case demonstrates serious problems connected with long-term suspension of visitation contact without either finding cause for an immediate termination of parental rights or making an extraordinary effort to find alternative means to evaluate one's current fitness for parenting.

In spite of our concerns just stated, giving some deference to the trial court, we find sufficient evidence to support the finding that Bonnie M.'s unfitness was adequately shown. Her initial abuse of the children was evident. The evidence shows guarded reason to expect an improvement of her ability to deal with the children. Although her problems with J.A. were more pronounced, evidence indicated that visitations last permitted involved poor interaction between the mother and both daughters. Her present marriage, although inadequately evaluated, shows a factor of peril for M.A. that justifies serious concern. We conclude that this evidence supports the trial court's decision to terminate the mother's rights respecting M.A., pursuant to section 260.221(b)(4).

### Failure to Correct
### Minn.Stat. § 260.221(b)(5)

Because of the close question we found here on the allegation of the mother's unfitness regarding her relationship with M.A., we have also examined the alternative allegation that reasonable efforts have "failed to correct" conditions leading to an initial dependency determination. *See* Minn.Stat. § 260.221(b)(5) (1986). In addition, M.A.'s best interests are a "paramount consideration" in case "the record demonstrates a long-term [foster care] placement characterized by a repeated failure of reasonable efforts to reunite the family." *J.J.B.*, 390 N.W.2d at 279, 280.

■ The record demonstrates the county failed to utilize "reasonable efforts" to correct the conditions leading to the dependency adjudication. The mother consented to the removal of her children because of stress due to financial problems. The welfare agency did not provide any assistance to relieve existing financial pressures, except to provide unspecified supportive services by the "collection worker." The plan demanded that the mother get money management counseling, obtain and maintain a job appropriate to her ability, and provide pay stubs to verify employment. These requirements are imposed without assessment of the skills necessary to achieve any of these tasks.

■ At a minimum, "reasonable efforts" requires the responsible agency to provide those services that would assist in alleviating the conditions leading to the de-

termination of dependency. *See K.P.C.,* 366 N.W.2d at 714–15. In this case, the welfare department did not provide any supportive services that would alleviate the financial stresses that existed in the home.[3] Instead, the foster placement plan imposes additional financial obligations on the parent. For example, the plan requires the mother to obtain and maintain adequate housing with rent payments current. There is no evidence that the welfare agency assisted in locating adequate and affordable housing.

In addition, the plan was primarily a litany of required services that were not related to the conditions that eventually gave rise to the dependency adjudication. Although such unrelated services may be appropriate in an individual case, including this one, the emphasis on unrelated services and the total exclusion of services necessary to correct the adjudicated unfavorable conditions is without precedent.

■ Reasonable efforts are examined more broadly in order to determine whether termination should be granted for the sake of the child's best interests. If there have been reasonable efforts "to reunite the family," these give rise to application of the best interests standards. *See J.J.B.,* 390 N.W.2d at 280. Viewed more generally, the public agency efforts here remain inadequate. Reasonable reuniting efforts were badly crippled by the decision to proceed without visitation contact. One therapist observed that therapy services could not be given under those circumstances. In addition, it is disturbing to see that the single comprehensive evaluation of the mother's needs and abilities, with a presumption to assist her, was completed four years after the children were placed and only weeks before the termination petition was filed. There is little in the record to demonstrate that the plan for dealing with this mother put within her reach the changed circumstances that would permit

reuniting her with M.A. We have observed before:

> To measure the adequacy of services, it is necessary to learn whether the services go beyond mere matters of form, such as the scheduling of appointments, so as to include real, genuine help to see that all things are done that might conceivably improve the circumstances of the parent and the relationship of the parent with the child. *See In re Welfare of White,* 363 N.W.2d 79, 80–81 (Minn.Ct. App.1985).

*In re Matter of Welfare of J.A.,* 377 N.W.2d 69 (Minn.Ct.App.1985).

The antagonism that was emphasized in the trial court's findings may be the result of the demands placed upon a parent who voluntarily placed her children in foster care, in recognition of her financial and emotional limitations at that time, and the unresponsive and demanding posture of the welfare agency. Based on the record, we conclude that the antagonistic relationship should not be the sole responsibility of the parent in this case, particularly where the parent has subsequently established cooperative relationships with helping professionals and expressed her frustrations singularly with those who have been the source of antagonism.

### DECISION

The trial court's order terminating the parent and child relationship between the parents and M.A. and J.A. is supported by sufficient evidence and is affirmed.

Affirmed.

### APPENDIX

Isanti County Family Services and Welfare Department

October 14, 1982

Foster Placement Plan

1. REASONS FOR PLACEMENT OF THE CHILDREN
   On September 24, 1982, a court hearing was held in Isanti County Family

---

**3.** For examples of meaningful services for parents of children placed in foster care due to poverty related problems, *see* Carol R. Golubuck, *Cash Assistance to Families: An Essential Component of Reasonable Efforts to Prevent and* *Eliminate Foster Care Placement of Their Children,* Clearinghouse Review 1393–1400 (April 1986) (discussing the "reasonable efforts" requirement of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–28).

Court to hear the amended petition regarding custody of [Bonnie M.'s] two minor children. [Bonnie M.] admitted to the amended petition and the Isanti County Family Court found the children dependent and placed the custody of the children with Isanti County Family Services for one year.

2. THE SPECIFIC ACTIONS TO BE TAKEN BY THE PARENT TO ELIMINATE OR CORRECT THE PROBLEMS OR CONDITIONS.

a. [Bonnie M.] will have a complete evaluation at the Five County Human Development Center and she will follow any recommendations for further counseling and/or treatment. [Bonnie M.] is expected to actively participate in all sessions that are set up with her, and she is expected to cooperate with the counseling to be able to gain insight and sensitivity. Counseling is to continue until the goals are achieved and the counselor recommends that counseling cease. Any other person living in [Bonnie M.'s] household will do the same.

b. [Bonnie M.] will undergo a chemical dependency evaluation by George Kaltenhauser, the Isanti County Family Services Chemical Dependency Counselor, and [Bonnie M.] will cooperate with Mr. Kaltenhauser's evaluation and recommendations until satisfactorily completed as determined by Mr. Kaltenhauser. If Mr. Kaltenhauser feels it is appropriate, [Bonnie M.] will refrain from the use of all alcoholic beverages of any kind and/or mood altering drugs or chemicals and if necessary attend weekly A.A. meetings with attendance slips signed. Any other person in [Bonnie M.'s] household will do the same.

c. [Bonnie M.] will attend all parenting classes recommended and available, and she will sign a release of information in order for her attendance to be verified. Further, [Bonnie M.] will pay for the cost of these classes.

Any other person in [Bonnie M.'s] household will do the same.

d. [Bonnie M.] will cooperate with specific supportive counseling on a one-to-one basis with a public health nurse and/or homemaker in regards to appropriate home care and clothing care techniques, and appropriate food shopping techniques. She will continue with this counseling until such time as the homemaker and/or public health nurse feel that she has learned the basic, minimum understanding.

e. [Bonnie M.] will obtain and maintain a job as appropriate to her ability, and provide pay stubs to verify her employment. Any other person in [Bonnie M.'s] household will do the same.

f. [Bonnie M.] will obtain and maintain adequate housing that will insure adequate space and beds for the children as well as permanency. The rent payments will be current and up to date with proof of payment or receipts. All utilities will be the same. The home will contain basic furnishings, linens, cooking and cleaning equipment normally found in any household.

g. [Bonnie M.] will install and maintain a telephone to enable her to keep herself in touch with the social worker and/or others in regards to the needs of her children.

h. [Bonnie M.] will keep the agency informed of her address and phone number at all times.

i. [Bonnie M.] will keep a basic supply of food in the house and show evidence of this supply to the social worker, i.e., grocery shopping lists, grocery store receipts, and food supply in the cupboards and refrigerator.

j. [Bonnie M.] will sign any and all releases of information as needed in order to appropriately service her and the children. Any other person in [Bonnie M.'s] household will do the same.

k. [Bonnie M.] will receive money management counseling from the social worker and any other person in

[Bonnie M.'s] household will do the same.

l. [Bonnie M.] will cooperate with counseling in regards to her violent tendencies and all violence will cease completely. Any other person in [Bonnie M.'s] household will do the same.

m. [Bonnie M.] will obtain a valid driver's license.

n. [Bonnie M.] will meet with the social worker on a regular basis, and if she is unable to make an appointment, she will give prior notice. Any other person living in [Bonnie M.'s] household will do the same.

\*       \*       \*       \*       \*       \*

5. THE SOCIAL AND OTHER SUPPORTIVE SERVICES TO BE PROVIDED TO THE PARENT OR PARENTS OF THE CHILDREN, THE CHILDREN AND THE FOSTER PARENTS DURING THE PERIOD THE CHILDREN ARE IN A FOSTER HOME.

a. *Services to the parents.*

Supervise and provide supportive services by the social worker, the collection worker, the CD counselor, the public health nurse and/or homemaker and any other staff person as appropriate. If needed, appropriate referrals will be made to other supportive services as necessary.

b. *The Children.*

Maintain and supervise the children's placement in foster care and provide for the children's needs.

c. *The Foster Parents.*

Supervise placement of the children and provide supportive services as needed.