*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0183**

In the Matter of the Welfare of the Children of:
E. M. U. and W. H. H., Parents.

**Filed July 20, 2015
Affirmed
Kirk, Judge**

Anoka County District Court
File Nos. 02-JV-13-1440, 02-JV-14-1012

Patricia A. Zenner, Stillwater, Minnesota (for appellant E.M.U.)

Anthony C. Palumbo, Anoka County Attorney, Kelsey R. Kelley, Assistant County Attorney, Anoka, Minnesota (for respondent Anoka County)

Judi Albrecht, Eagan, Minnesota (guardian ad litem)

Alisha Olmstead, Ramsey, Minnesota (guardian ad litem)

Considered and decided by Kirk, Presiding Judge; Schellhas, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**KIRK**, Judge

Appellant-mother challenges the district court's order terminating her parental rights. We affirm.

**FACTS**

Appellant-mother E.M.U. is the biological mother of fourteen-year-old N.J.U. and two-year-old B.M.H.-U. N.J.U.'s father is deceased, and B.M.H.-U.'s father is W.H.H. E.M.U. and W.H.H. divorced in September 2013.[1]

A five-day trial was held in December 2014, where E.M.U. was present and represented by legal counsel. On January 16, 2015, the district court issued amended findings of fact and conclusions of law, finding that there was clear and convincing evidence supporting the termination of E.M.U.'s parental rights to B.M.H.-U. under Minn. Stat. § 260C.301, subds. 1(b)(1), (2), (4), (5), (6), (8) (2014). The district court ordered N.J.U. to be placed in long-term foster care. The district court's post-trial findings of fact are summarized below.

In October 2013, B.M.H.-U. was hospitalized for a blood and urinary tract infection and E.M.U. and N.J.U. stayed with B.M.H.-U. in her hospital room. Hospital staff observed that E.M.U. failed to provide appropriate care to B.M.H.-U. Staff repeatedly found B.M.H.-U. in a wet diaper or covered in feces while E.M.U. slept through multiple loud alarms indicating that B.M.H.-U. was in need of immediate care. E.M.U. also failed to comply with staff instructions on how to feed B.M.H.-U.

On October 17, Anoka County Social Service (ACSS) placed a 72-hour police hold on B.M.H.-U., and a few days later filed a child-in-need-of-protection-or-services petition regarding B.M.H.-U. and N.J.U. On December 10, the district court adjudicated

---

[1] On January 16, 2015, the district court terminated W.H.H.'s parental rights to B.M.H.-U.

B.M.H.-U. in need of protection or services and transferred custody of the child to the county while N.J.U. was allowed to remain at home with E.M.U. under protective supervision by the county. The district court ordered E.M.U. to cooperate with county-referred services including a parenting assessment, assistance from a public health nurse, a psychological evaluation, and in-home services. E.M.U. agreed to cooperate with the service providers.

During the next several months, E.M.U. met with numerous county-referred service providers who separately documented their concerns about her parenting abilities. The county conducted a parenting assessment indicating that E.M.U.'s mental health was a significant concern, as it negatively impacted her ability to parent her children. The assessment recommended that if E.M.U.'s mental health did not stabilize, the county should consider alternative placement options for B.M.H.-U. A mental-health practitioner who met weekly with E.M.U. for approximately six months to assist E.M.U. in improving her parenting skills testified at the termination-of-parental-rights trial that she believed that E.M.U. needed long-term psychiatric care, and that she was unable to parent B.M.H.-U. on a daily basis. An evaluator who completed an attachment assessment of B.M.H.-U.'s relationship with E.M.U. concluded that B.M.H.-U. was at tremendous risk for future developmental problems if she was returned to E.M.U.'s care. The evaluator also noted that N.J.U.'s relationship with E.M.U. was emotionally incestuous. The evaluator recommended that both children be permanently placed outside of E.M.U.'s custody. E.M.U. also completed a psychological evaluation and the psychologist diagnosed E.M.U. with schizotypal personality disorder and unspecified

3

attention deficit hyperactivity disorder. In light of this mental-health diagnosis, the psychologist characterized E.M.U.'s prognosis as "poor."

In January 2014, E.M.U. and N.J.U. became homeless. With the assistance of E.M.U.'s case manager, E.M.U. and N.J.U. relocated to a transitional housing complex for individuals with mental illness. But shortly after they moved in, housing staff notified E.M.U.'s case manager about their concerns regarding E.M.U.'s odd behaviors, which included E.M.U. reporting hearing and seeing things that were not real. In April 2014, E.M.U. agreed to go to the hospital for a mental-health evaluation and N.J.U. was placed on a police hold and in foster care. After an emergency hearing, the district court concluded that N.J.U. continued to be a child in need of protection or services and continued his placement in foster care.

While hospitalized, E.M.U. was diagnosed with borderline personality disorder. In her discharge report, her psychiatrist recommended that she participate in an extensive dialectic behavioral theory (DBT) program, visit a therapist and psychiatrist, avoid alcohol, drugs, and visit a pain specialist. But E.M.U.'s mental health continued to degenerate. Approximately one week after being discharged from the hospital, E.M.U. received opioid drugs for pain management at a different hospital. From April through September, E.M.U. failed to attend all but one session of DBT therapy. On April 28, police and an ambulance were dispatched to E.M.U.'s residence after E.M.U. was reportedly knocked unconscious when a box spring fell on her head. E.M.U. reported to ACSS that the incident negatively impacted her memory and that she could not remember

4

appointments and previous conversations. E.M.U. continued to seek and obtain opioid pain medications for a variety of physical ailments from various hospitals.

On August 13, Anoka County filed a petition to terminate E.M.U.'s parental rights to both children. One week later, E.M.U. attempted to commit suicide. E.M.U. was placed on a 72-hour hold and was transported to the hospital where a staff psychiatrist determined that E.M.U. was at high risk for further suicide attempts and recommended civil commitment. During her stay, E.M.U. attempted to cut herself with a plastic knife. The hospital petitioned for commitment. A licensed psychologist who completed a court-ordered examination of E.M.U. opined that she could be released to her sister's care and that she could be considered a candidate for a stay of commitment to access recommended psychiatric and therapeutic services.

On September 16, the district court held a hearing on the hospital's petition for judicial commitment and found that E.M.U. was mentally ill with diagnoses of mood disorder, not otherwise specified, and borderline personality disorder. The district court stayed E.M.U.'s civil commitment for six months on the following conditions: that E.M.U. follow the recommendations of her treatment team; schedule and attend appointments with a psychiatrist as recommended by the treatment team; take all prescribed medication; schedule and attend DBT therapy and any aftercare treatment; refrain from using alcohol or mood-altering chemicals; and submit to one provider for medical medications and one provider for psychiatric medications.

One month later, the district court revoked its stay of commitment, finding that E.M.U. violated its conditions by twice failing to show up for group treatment, failing to

5

take her medications as prescribed, and not attending her individual therapy or psychiatry appointments. The district court concluded that E.M.U. satisfied the statutory criteria for civil commitment and ordered her to be committed to the Commissioner of Human Services for treatment. The district court ordered E.M.U. to remain hospitalized pending an opening at a designated facility.

The psychiatrist who tended to E.M.U. while she was civilly committed testified at trial that she continued to report unsubstantiated medical issues to hospital staff, had "boundary issues" with other patients, and displayed hyper moods and intrusive behaviors. A mental-health worker, who was assigned to manage E.M.U.'s stay of commitment, testified at trial that E.M.U. had physically assaulted a nurse and was restrained after hospital staff attempted to separate her from a male patient on the ward. The mental-health worker testified that E.M.U. was "constantly having to be reminded about her behaviors and [was] not controllable."

At the time of trial, B.M.H.-U. and N.J.U. had been in foster care for approximately 14 months and eight months, respectively. On October 9, 2014, the guardian ad litem reported to the district court that both children were doing well in foster care. B.M.H.-U. was "developing a strong attachment and bond" with her foster parents, no longer suffered from the constant medical problems she had experienced under E.M.U.'s care, and was developmentally "on track" according to her pediatrician. N.J.U. was getting along with his peers at school and in his foster home and was no longer focused on germs or other health concerns as he had been while in E.M.U.'s care.

E.M.U. appeals.

6

**D E C I S I O N**

**I.  E.M.U.'s due-process rights were not violated when the district court addressed bases for termination of her parental rights not pleaded in the petition.**

"[P]arental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 709 (Minn. App. 2004).  Minn. Stat. § 260C.301, subd. 1(b) (2014), states that "[t]he juvenile court may upon petition, terminate all rights of a parent to a child . . . if it finds that one or more of the [statutory grounds for termination] exist."  The "best interests of the child" are the "paramount consideration" in a termination of parental rights proceeding.  *Id.*, subd. 7.

"Whether a parent's due process rights have been violated in a termination proceeding is a question of law, which this court reviews de novo." *In re Welfare of Children of B.J.B.*, 747 N.W.2d 605, 608 (Minn. App. 2008).  "[T]ermination of parental rights cannot be based on a statutory ground that was not included in a petition to terminate parental rights." *In re Welfare of Child of B.J.-M.*, 744 N.W.2d 669, 673 (Minn. 2008).

E.M.U. argues that her due-process rights were violated because the county only alleged two grounds for terminating her rights under Minn. Stat. § 260C.301, subds. 1(b)(4) and 1(b)(5).  But the district court found that there was clear and convincing evidence to terminate her parental rights under these two statutory provisions and additional subdivisions of the statute.

We conclude that because the district court found clear and convincing evidence supporting at least one statutory provision alleged in the county's petition, E.M.U.'s due-

process rights were not violated by the district court's inclusion of additional grounds supporting the termination of E.M.U.'s parental rights. *See In re Welfare of Child of T.D.*, 731 N.W.2d 548, 556 (Minn. App. 2007) (holding that, although the district court erred in finding additional statutory grounds for terminating parental rights not alleged by the county, "because at least one statutory ground supports termination in this case, . . . the error does not affect our decision to affirm the termination of T.D.'s parental rights").

**II. The district court did not err by finding clear and convincing evidence that E.M.U. is palpably unfit to parent.**

Whether to terminate parental rights is discretionary with the district court. *In re Welfare of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014). Similarly, whether a specific statutory basis for terminating parental rights is present in a particular case is a decision that is also discretionary with the district court. *See In re Welfare of J.R.B.*, 805 N.W.2d 895, 899-902 (Minn. App. 2011) (explaining the process the district court goes through when determining whether a statutory basis for terminating parental rights is present in a particular case and that this decision is discretionary with the district court), *review denied* (Minn. Jan. 6, 2012); *see* Minn. Stat. § 260C.301, subd. 1(b) (2014) (listing statutory bases for terminating parental rights).

The petitioning county bears the burden of proving grounds for termination by clear and convincing evidence. *In re Welfare of M.H.*, 595 N.W.2d 223, 227 (Minn. App. 1999). On appeal, we review the record to determine whether the district court applied the appropriate statutory criteria and made findings that are not clearly erroneous. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). A finding is clearly

8

erroneous when "it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). We grant the district court's decision considerable deference because the "court is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

A district court may terminate parental rights to a child if the court finds that the parent

> is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing, physical, mental, or emotional needs of the child.

Minn. Stat. § 260C.301, subd. 1(b)(4). The county "must prove a consistent pattern of specific conduct or specific conditions existing at the time of the hearing that appears will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of the child." *T.R.*, 750 N.W.2d at 661 (quotation omitted). In a termination case, the district court "relies not primarily on past history, but 'to a great extent upon the *projected* permanency of the parent's inability to care for his or her child.'" *In re Welfare of Solomon*, 291 N.W.2d 364, 368 (Minn. 1980) (quoting *In re Welfare of Kidd*, 261 N.W.2d 833, 836 (Minn. 1978) (emphasis added)).

E.M.U. argues that the district court failed in its findings to account for the fact that her mental illness had been historically inaccurately diagnosed, but at the time of the

trial she was receiving appropriate care for her mental-health issues and could parent her children.

The district court concluded that E.M.U. was palpably unfit to parent because her borderline personality disorder diagnosis requires "lengthy residential treatment and a program of DBT which may encompass up to two years if [E.M.U.] is consistent and cooperative with treatment. In the past, she has not shown that she can consistently address her treatment needs on a voluntary basis."

The district court did not abuse its discretion when it concluded that E.M.U. is palpably unfit to parent B.M.H.-U. and N.J.U. E.M.U. has a long history of mental-health issues, including borderline personality disorder, which is defined under Minnesota statute as a serious and persistent mental illness under certain circumstances. *See* Minn. Stat. § 245.462, subd. 20 (2014). E.M.U.'s mental illness negatively impacted her ability to effectively parent B.M.H.-U. and N.J.U. At trial, the psychologist testified that E.M.U. had a "moderately severe" diagnosis of borderline personality disorder and would need at least nine to 15 months of DBT therapy after her civil commitment ended. The psychologist cautioned that the timeline was predicated on E.M.U. constantly attending her DBT therapy sessions. But E.M.U. demonstrated strong resistance to complying with recommended treatment. In April 2014, E.M.U. failed to follow the psychiatrist's orders to attend DBT therapy. E.M.U. also violated the stay of her civil commitment by refusing to follow through with her recommended treatment program, which included continued attendance and participation in therapy and avoidance of unprescribed prescription medication. Moreover, hospital staff reported that during

10

E.M.U.'s civil commitment, she remained uncontrollable and displayed perseverative behaviors relating to various medical complaints. The record supports the district court's determination that E.M.U. failed to successfully address her mental-health issues during the pendency of the trial, and that she will continue to be unfit to parent for the foreseeable future. Therefore, we conclude that the district court did not abuse its discretion by invoking the palpable unfitness basis to terminate E.M.U.'s parental rights.

**III. The district court did not clearly err by finding clear and convincing evidence that reasonable efforts failed to correct the conditions leading to the foster care placement of the children.**

In a termination of parental rights proceeding, the district court is required to make findings of fact addressing the reasonable efforts provided by social services to reunite the family, or to find that such efforts would be futile. *In re Children of T.A.A.*, 702 N.W.2d 703, 709 (Minn. 2005); *see also* Minn. Stat. §§ 260.012, 260C.301, subd. 8 (2014). In making this determination, the district court must consider numerous factors, including the services' relevancy to the safety and protection of the child, adequacy, availability, accessibility, consistency, and whether the services were realistic under the circumstances. Minn. Stat. § 260.012(h).

E.M.U. argues that the district court erred in not affording her the opportunity to parent her children following her civil commitment. E.M.U. contends that she was "undergoing a temporary mental-health crisis" due to her prescribed medications. In support of her argument, E.M.U. points to the fact that she had properly cared for N.J.U. up to his placement in foster care, that she functioned much better when she was not

11

prescribed Klonopin, and that her sister and longtime friend testified at trial that she was a good parent prior to her recent hospitalizations.

The district court concluded that further efforts would be futile and unreasonable because E.M.U. "has repeatedly refused or neglected to comply with the duties imposed upon the parent and child relationship" including providing the necessary care and control of the child's mental, physical, and emotional development. The district court described reasonable efforts by ACSS, including utilizing social workers, psychologists, in-home services, a parenting assessment, public-health nursing, transitional housing staff, an attachment assessment, mental-health workers, and hospital staff.

The district court's determination is supported by clear and convincing evidence. Over a 14-month period, E.M.U. received intensive, one-on-one parenting training and education, but was unable to appropriately parent B.M.H.-U. N.J.U. was also negatively impacted by E.M.U.'s poor parenting and was academically behind after three years of homeschooling. In addition, E.M.U. failed to take her mental-health therapy seriously, as she consistently missed appointments, to the detriment of herself and her children. Despite the fact that Mercy Hospital staff took E.M.U. off many opioid pain medications and the district court stayed her civil commitment on the condition that she refrain from mood-altering chemicals, E.M.U. continued to seek and acquire opioid painkillers.

E.M.U.'s history of non-compliance with treatment providers made it impossible for her case manager to find a treatment program willing to collaborate with her. As a result, E.M.U.'s mental health deteriorated to the point that she was civilly committed, where she continued to demonstrate lack of control and mental-health issues at the time

12

of trial. There is no statute or caselaw requiring the district court to give E.M.U. another opportunity to parent her child after release from civil commitment. Moreover, the district court found the testimony of E.M.U.'s sister and longtime friend to be not credible. This court defers to the district court's credibility determinations. *L.A.F.*, 554 N.W.2d at 396.

**IV.     The district court did not abuse its discretion by finding that it was in B.M.H.-U.'s best interests for E.M.U.'s parental rights to be terminated.**

The district court may terminate all rights of a parent to a child on one or more of nine statutory grounds. *B.J.-M.*, 744 N.W.2d at 672. Appellate courts review the district court's parental-rights determination for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 900. In analyzing the child's best interests, "the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *Id.* "An appellate court may affirm a termination of parental rights if at least one statutory basis for termination is present and termination is in the children's best interests." *J.R.B.*, 805 N.W.2d at 906.

E.M.U. argues that there is substantial evidence in the record demonstrating that it is not in the best interests of the children to terminate her parental rights because she is able to parent when she does not suffer from mental illness. E.M.U. contends that at the time of trial, her mental health had stabilized and that she had agreed to short-term

13

continued care at Anoka Metro Regional Treatment Center. E.M.U. relies on *In re Welfare of M.A.* to argue that the district court could not hold her civil commitment at the time of trial against her because, in her words, "the inability to return a child immediately to the parental home cannot provide the basis of terminating parental rights." 408 N.W.2d 227, 233 (Minn. App. 1987) (stating that "there is no legal basis for granting termination solely because the child cannot be returned immediately to the parental home"), *review denied* (Minn. Sept. 18, 1987). Moreover, E.M.U. contends that there is substantial evidence that she was a good mother to N.J.U. prior to her recent hospitalizations. E.M.U. requests that this court remand the case to the district court and that it continue as a CHIPS proceeding.

The district court determined that termination of E.M.U.'s parental rights served the child's best interests, stating "the [c]ourt has considered the interests of the parents and the child in preserving the relationship. The child's needs for stability, safety, and permanency, with nurturing, competent caregivers outweighs any competing interests of the parents."

Here, the district court did not abuse its discretion in ruling that termination of appellant's parental rights is in the child's best interests. *J.R.B.*, 805 N.W.2d at 906. Numerous mental-health and service providers and the children's guardian ad litem all concluded from their observations that B.M.H.-U. was disattaching from E.M.U., who was unable to read B.M.H.-U.'s cues and could not properly parent her. Moreover, the evaluator who completed the attachment assessment warned that B.M.H.-U. was at tremendous risk if E.M.U. continued to parent her, and that N.J.U. had become

14

emotionally disturbed while under E.M.U.'s care.  At the time of trial, B.M.H.-U. was 21 months old and had spent more than half of her life in foster care, where she was thriving and was no longer demonstrating the medical issues that E.M.U. insisted were present while under her care.

**Affirmed.**