**In re the Matter of the WELFARE OF M.G. and C.G., Minors.**

No. C9–86–1743.

Court of Appeals of Minnesota.

June 2, 1987.

W.M. Gustafson, Nicollet Co. Atty., Michael K. Riley, Sr., Sp. Asst. Co. Atty., St.

Peter, Mark C. Halverson, Mankato, for appellant.

James J. Hulwi, Jr., Mankato, for Mother.

Greggory J. Woods, St. Peter, respondent Guardian.

Considered and decided by CRIPPEN, P.J., and LESLIE and STONE,* JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

A father of two children questions the sufficiency of evidence to support termination of his parental rights. We affirm.

## FACTS

Appellant J.S.G. and his ex-wife, S.G., are the parents of two minor children: M.G., born August 24, 1981, and C.G., born October 18, 1982. In June 1983, on behalf of M.G. and C.G., Nicollet County officials began juvenile protection proceedings against appellant and S.G. J.S.G. and S.G. admitted the children were neglected and dependent, and they voluntarily transferred custody of the children to the Nicollet County Welfare Board, which placed the children in foster care.

The county and the parents then entered into a rehabilitation plan, with the goal of reuniting the family. Under the plan, J.S.G. agreed to find work, attend weekly counseling sessions, attend parenting classes, visit M.G.'s Open Arms program at the county's Developmental Achievement Center (DAC), continue scheduled weekly visitations with both children, and maintain contact with the county social worker on a weekly basis.

In February 1984, upon evidence of satisfactory progress by J.S.G. and S.G., a second rehabilitation plan was implemented, similar to the first but providing for overnight visitations. In March, the children were returned to the family home because of problems in finding a suitable foster home for them. The county continued to provide counseling and social worker services, and added the services of an in-home family support worker. M.G. continued to attend the Open Arms program, where he had been diagnosed as a special needs child.

After the children returned home, J.S.G. and S.G. were unable to effectively discipline the children. In September 1984, while in his parents' care, M.G. was seriously burned when he pulled a pot of boiling water off the kitchen stove. He was also injured when he cut himself with a knife. At the same time, the parents' marital situation deteriorated, resulting in their permanent separation in October. In December, the court ordered M.G.'s removal from the home and his placement with foster parents. C.G. continued to live with S.G. until May 1985, when S.G. was hospitalized and C.G. was placed with the foster parents who were caring for M.G.

By the time M.G. was removed from the home for the second time, J.S.G. had met only two of the participation requirements of the rehabilitation plans, those of finding employment and of visiting M.G. at the DAC. He had not attended the weekly counseling sessions or the parenting classes, and he had not maintained regular contact with the social worker. The in-home workers had difficulty establishing any type of contact with J.S.G.

Despite these failures, the county and J.S.G. entered into a third plan in January 1985, under which J.S.G. agreed to attend a weekly nurturing program, to attend a "Daddy and Me" program with C.G., and to obtain a psychological assessment and follow through on recommendations for counseling. The plan provided for weekly visits by in-home aides and therapists.

J.S.G.'s progress did not improve under the revised plan. He participated in the "Daddy and Me" program with C.G. However, in April 1985, the nurturing class coordinator notified J.S.G. that he had already missed the first three of the eleven scheduled sessions, that he would have to drop the class because he had missed too

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

much information, and that he should contact her about the situation. J.S.G. did not respond to the notice. As before, he did not obtain counseling help.

In March 1986, based on J.S.G.'s demonstrated failure to respond to efforts to rehabilitate him as a parent to M.G. and C.G., the county filed a termination of parental rights petition. After a hearing, the trial court issued findings and granted the petition. The court based the termination order on two statutory grounds: (1) that the parents failed to correct conditions leading to a previous determination of neglect and dependency, and (2) that the minor children are neglected and in foster care. *See* Minn.Stat. § 260.221(b)(5) and (7) (1986). Only J.S.G. appeals.

## ISSUE

Is the trial court's termination of J.S.G.'s parental rights supported by clear and convincing evidence?

## ANALYSIS

### 1.

As a matter of law, termination of parental rights is not a preferred action. The laws relating to juvenile courts are designed to "preserve and strengthen the child's family ties whenever possible." Minn.Stat. § 260.011, subd. 2 (1986). Guided by that preference, the Minnesota Supreme Court has established significant restrictions on the termination remedy, including standards on the nature and extent of the petitioner's evidence, requirements for trial court findings, and standards for appellate review.

1. *See In re Klugman,* 256 Minn. 113, 120, 97 N.W.2d 425, 430 (1959); *State ex rel. Fossen v. Hitman,* 164 Minn. 373, 375, 205 N.W. 267, 268 (1925) (custody); *State ex rel. Platzer v. Beardsley,* 149 Minn. 435, 439, 183 N.W. 956, 958 (1921); *State ex rel. Renning v. Armstrong,* 141 Minn. 47, 49, 169 N.W. 249 (1918) (custody); *In re Welfare of K.P.C.,* 366 N.W.2d 711, 714 (Minn. Ct.App.1985); *In re Welfare of White,* 363 N.W.2d 79, 80 (Minn.Ct.App.1985).

2. *See In re Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978).

3. *See In re Welfare of P.J.K.,* 369 N.W.2d 286, 290 (Minn.1985).

Petitioners have the burden of proving their allegations by clear and convincing evidence. *In re Welfare of Rosenbloom,* 266 N.W.2d 888, 889–90 (Minn. 1978). Trial courts should not permit termination "except for grave and weighty reasons." *In re Welfare of H.G.B.,* 306 N.W.2d 821, 825 (Minn.1981) (citation omitted). The trial court must find that "one or more" conditions under the statute support termination. *See* Minn.Stat. § 260.221 (1986) (grounds for termination of parental rights); *In re Welfare of R.M.M.,* 316 N.W.2d 538, 541 (Minn.1982).

In addition, the supreme court has construed the statute to require "that the evidence relating to termination must address conditions that exist at the time of the hearing," and "that it must appear that the present conditions of neglect will continue for a prolonged, indeterminate period." *In re Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn.1980). The decision may not be based on the parents' financial condition,[1] mental health,[2] or degree of intelligence.[3]

Finally, the supreme court has recognized the best interests of the child as a "paramount consideration" in termination of parental rights proceedings. *In re Welfare of J.J.B.,* 390 N.W.2d 274, 279 (Minn. 1986). Previously, the court introduced the best interests of the child as an ingredient in cases where the grounds for termination were that "the child is neglected and in foster care." *See H.G.B.,* 306 N.W.2d at 826–27 (construing Minn.Stat. § 260.-221(b)(7)).[4] In 1986, the supreme court ex-

4. *H.G.B.* involved the supreme court's first construction of a 1978 legislative amendment that added, as a ground for termination, that "the child is neglected and in foster care." *See* 1978 Minn.Laws ch. 602, § 10 (codified at Minn.Stat. § 260.221(b)(7) (1986)). Subdivision (b)(7) incorporated into the termination of parental rights proceedings the statutory provisions for determining whether a child "is neglected and in foster care," which specifically include the child's best interest. *See* Minn.Stat. § 260.155, subd. 7 (1986). In construing the new statutory grounds, the supreme court concluded that "the legislature intended to incorporate a balancing process into the termination of parental rights

tended the best interests doctrine to any case where "the record demonstrates a long-term [foster care] placement characterized by a repeated failure of reasonable efforts to reunite the family," regardless of which of the specific statutory grounds for termination had been alleged. *J.J.B.,* 390 N.W.2d at 280.

■ Under the best interests standard, there must be a balancing of the child's interest in preserving the parent-child relationship, an interest shared by the parents, against any competing interests of the child. Competing interests include stability (demonstrated by the length of time in foster care),[5] the choice that the child expresses between placement alternatives,[6] and the child's health.[7]

The trial court's decision for termination must be supported by "clear and specific findings which conform to the statutory requirements." *R.M.M.,* 316 N.W.2d at 540–41.

■ There is a broad standard of appellate review in termination of parental rights cases. *See Chosa,* 290 N.W.2d at 769. Although "some deference" is given to the trial court's findings, appellate courts " 'exercise great caution in termination proceedings,' " and "will closely inquire into the sufficiency of the evidence to determine whether the evidence is clear and convincing." *In re Welfare of Clausen,* 289 N.W.2d 153, 156 (Minn.1980) (quoting *In re Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978)).

**2.**

The trial court found that two statutory conditions support the termination of J.S. G.'s parental rights. First, the court found that reasonable efforts, under the direction of the court, failed to correct conditions leading to the earlier determination of neglect and dependency. *See* Minn.Stat. § 260.221(b)(5) (1986). The court also found the children are neglected and in foster care. *See id.* § 260.221(b)(7).

*Failure to Correct Conditions—§ 260.-221(b)(5)*

■ The trial court found that both parents "clearly understood what was expected of them under the provisions of the rehabilitation plan in order to have their children returned," but that J.S.G. failed in several essential requirements. First, the court found J.S.G. initially made the weekly visits with the children, but that he made no visits in the two months preceding the hearing on the termination petition. The court acknowledged J.S.G.'s claim that his work schedule prevented visitation, but found the "allegation is untrue."

Second, J.S.G. failed to attend either the weekly nurturing program or the weekly parenting program. The court noted J.S.G. did attend the "Daddy and Me" class with C.G., but that this did not fulfill the requirements of the nurturing program. The court further found J.S.G. started the nurturing program on three different occasions but never completed it, and that even after receiving a letter and a personal visit

proceedings * * * [and] this process considers both the interests of the parents and the best interests of the child." *H.G.B.,* 306 N.W.2d at 827.

5. *See J.J.B.,* 390 N.W.2d at 279 (emphasizing the importance of emotional and psychological stability to a child's sense of security as well as the fundamental significance of permanency to a child's development). *See also* Minn.Stat. § 518.17, subd. 1(c), (d), (e), (f) (1986) (the best interests of the child includes consideration of (c) the child's relationship with people who may significantly affect their best interests; (d) the child's adjustment to home, school, and community; (e) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity; and (f) the

permanence of the existing or proposed custodial home).

6. *See, e.g., State ex rel. Feeley v. Williams,* 176 Minn. 193, 197, 222 N.W. 927, 928 (1929); *Gauthier v. Walter,* 110 Minn. 103, 106, 124 N.W. 634, 635 (1910). *See also* Minn.Stat. § 518.17, subd. 1(b) (1986) (the best interests of the child includes consideration of the reasonable preference of the child).

7. *See, e.g., State ex rel. Link v. Mason,* 179 Minn. 472, 474, 229 N.W. 582 (1930); *State ex rel. Lund v. Anderson,* 175 Minn. 518, 519, 221 N.W. 868, 869 (1928). *See also* Minn.Stat. § 518.17, subd. 1(g) (best interests of the child includes consideration of the health needs of all individuals involved).

from a county worker regarding the program, J.S.G. "still failed to make any effort to complete the program."

Third, the court found that although J.S.G. "has shown some improvement in his parenting skills," he "has not shown much motivation in being the type of parent which would allow the children to be returned to his custody." As additional examples of J.S.G.'s unsuitability as a parent, the court listed his failure to care for C.G. when S.G. was hospitalized in May 1985, his failure to pay support, his failure to keep in contact with service providers or advise them as to his change of address, his admitted sexual improprieties with a teen-age girl, and the existence of a current sexual abuse investigation of J.S.G. regarding the child of his live-in companion. Finally, although J.S.G. stated at the hearing that he had an appointment for psychiatric counseling, the court observed he had done nothing to obtain counseling during the six month pendency of the termination proceedings. These findings conform with the statutory requirements and are supported by the evidence.

Appellant nevertheless claims the county failed its burden of making reasonable efforts to correct the conditions leading to the earlier determination of neglect and dependency. He claims the rehabilitation plans were not revised to reflect changes in the family's living situation and that the county made insufficient efforts to help him meet his parenting goals through use of the available social services.

■ The record does not support these claims. Whether efforts are "reasonable" requires consideration of the length of time the county has been involved with the family as well as the quality of effort given. *See J.J.B.*, 390 N.W.2d at 281. Here, court-sanctioned work by the county with the family began over three years before the hearing on the petition to terminate parental rights. The county's commitment to helping J.S.G. is expressed in the language

of the plan itself, which details not only the parents' responsibilities but the responsibilities undertaken by the county. Although it is also evident that the county's efforts to "prod" appellant into fulfilling his contract decreased as time went by, this coincides with his failure to respond to these efforts, and is understandable. Indeed, the county workers' efforts during the initial period of the agreement were substantial. The trial court ratified the reasonableness of the county's efforts when it found J.S.G. "clearly" understood what was expected of him under the provisions of the plan.

The record shows the trial court considered the conditions that existed at the time of the hearing as well as the conditions that preceded the county's petition for termination and that led to the 1983 determination that the children were neglected and dependent. The evidence and the court's findings on J.S.G.'s unwillingness "to cooperate with the rehabilitation plan" also support the conclusion that the present neglectful conditions will continue for a prolonged, indeterminate period.

The trial court's determination is consistent with the best interests of M.G. and C.G. The evidence demonstrates there has been a long-term placement in foster care, characterized by a repeated failure of reasonable efforts to rehabilitate the parents and reunite the family. *See id.* at 280. During the months that the children were reunited with their parents in 1984, J.S.G. was not able to effectively discipline or care for the children. The foster parents report greater discipline problems with the children after visitations with their parents.

Moreover, the trial court also considered M.G.'s special needs,[8] particularly his need for "a structured setting with definite limits imposed on his behavior." The court found J.S.G. is unable to provide the structure necessary for M.G.'s growth and care. *See In re Welfare of Adams*, 352 N.W.2d 105, 106–07 (Minn.Ct.App.1984), *pet. for*

---

**8.** M.G. was diagnosed with a seizure disorder when he was 11 months old, which must be controlled with daily doses of phenobarbital. He began wearing corrective lenses before age 3 and has had eye surgery. M.G.'s primary behavioral problem is described as a lack of fear of personal injury and a lack of judgment, which he often demonstrates by testing all limits placed upon him, and which has resulted in several injuries.

*rev. denied,* (Minn. Nov. 8, 1984) (development of "special needs" child stymied under parent's care).

In the conflict presented between the interests of preserving the family and the other interests of the children, J.S.G.'s parental rights must yield to the children's interests for a stable home with satisfactory parenting and a healthy environment that will give M.G.'s special needs the appropriate attention and care.

*Neglected and in Foster Care—§ 260.-221(b)(7)*

Appellant also claims the court erred in finding the children are neglected and in foster care. *See* Minn.Stat. § 260.221(b)(7) (1986). "Neglected and in foster care" is defined as a child "(a) Who has been placed in foster care by court order; and (b) Whose parents' circumstances, condition, or conduct are such that the child cannot be returned to them; and (c) Whose parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct * * *." Minn.Stat. § 260.015, subd. 18 (1986). In determining whether a child is neglected and in foster care, the court must consider several factors, some of which are detailed in the statute. *See* Minn.Stat. § 260.155, subd. 7(1)–(7) (1986).

Cases brought under the "neglected and in foster" care provisions require particular attention to five circumstances. First, do the present conditions prevent the children's return? *See* Minn.Stat. § 260.015, subd. 18(b). Second, how long have the children been in foster care? *See* Minn. Stat. § 260.155, subd. 7(1). Third, has there been a failure to make reasonable efforts to correct neglectful conditions? Minn.Stat. §§ 260.015, subd. 18(c), 260.155, subd. 7(2). Evidence of nonsupport and nonvisitation is germane to this circumstance. *See* Minn.Stat. § 260.155, subd. 7(3), 7(4). Fourth, has the public agency made reasonable efforts and have the necessary rehabilitative services been available? Minn.Stat. §§ 260.015, subd. 18(c), 260.155, subd. 7(5), 7(7). Fifth, would additional services be effective to bring about lasting parental adjustment and the return of the children to the parent within an ascertainable period of time? Minn.Stat. § 260.155, subd. 7(6). Each of these circumstances must be evaluated with a view to determining the best interests of the child. *H.G.B.,* 306 N.W.2d at 826–27 (articulating the standards for termination under section 260.221(b)(7)).

We agree with appellant that the trial court findings may be inadequate to support the termination of his parental rights on the grounds that the children are "neglected and in foster care." The court's findings do not specifically reference the standards articulated in sections 260.015, subd. 18 and 260.155, subd. 7 as pertinent to a finding of neglected and in foster care. In particular, because C.G. does not have the special needs that M.G. has, and because her younger age presents more possibilities for her return to J.S.G.'s care without lasting damage, the trial court should have made additional findings that demonstrate the applicability of section 260.221(b)(7) to the termination of J.S.G.'s parental rights to C.G.

We have already concluded, however, that the trial court's findings support the termination of J.S.G.'s parental rights under section 260.221(b)(5). Each of the trial court's findings is supported by clear and convincing evidence in the record; they are consistent with the express testimony of the various social workers who have assisted the family over the past few years, as well as the testimony of the children's guardian ad litem. There is also sufficient evidence to support the trial court's finding that it is in the best interests of the children to terminate the parental rights of J.S.G. and S.G.

**DECISION**

The trial court's decision to terminate J.S.G.'s parental rights is supported by adequate findings and clear and convincing evidence in the record.

Affirmed.