**In the Matter of the WELFARE OF D.F.B. and M.A.B., Children.**

**No. C3–86–2189.**

Court of Appeals of Minnesota.

Sept. 22, 1987.

Review Denied Nov. 18, 1987.

Cecil E. Naatz, Marshall, for appellant.

David W. Peterson, Marshall, for respondent.

Heard, considered and decided by CRIPPEN, P.J., and LESLIE and LOMMEN *, JJ.

## OPINION

CRIPPEN, Judge.

The trial court terminated appellant's rights as a mother of two sons, based on evidence of substantial and continuous neglect; the failure of reasonable efforts to correct a finding that the children were dependent; and the failure of the parent to improve her circumstances, such that the children could not be returned to her custody. Minn.Stat. § 260.221(b)(2), (5) and (7) (1986). On the mother's appeal, we affirm.

## FACTS

Appellant Tammy B. is the mother of D.F.B., born July 31, 1983, age three at the time of trial of this case, and M.A.B., born October 25, 1985, age one at the time of trial. Tammy B. was 16 years old when D.F.B. was born, and 19 at the time of trial.

On January 8, 1985, when D.F.B. was one and one-half years old, appellant approached public authorities in Lyon County, proposing that her parental rights to the child be terminated. She felt she could not care for her son because of the stress she was experiencing and the instability of her emotions. On the insistence of appellant, the child was immediately placed in foster care. Two weeks later, based on the agreement of appellant to cooperate in the furnishing of in-home services, the child was adjudicated dependent. D.F.B. remained in foster care for eight months, first with one family, before they left the community, and then with a second family.

D.F.B. was returned to appellant on August 19, 1985, 10 weeks before the birth of his brother, M.A.B. On November 14, 1985, 20 days after M.A.B. was born, Tam-

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

my B. requested that both children be placed in foster care. Both children were then placed in the foster home where they still reside. The welfare of D.F.B. remained under the jurisdiction of the court, and dependency of M.A.B. was adjudicated on July 31, 1986.

When the children were placed in foster care in November, Tammy B. signed a petition for termination of her parental rights regarding both children. She was told at the time that she could not place the children in foster care unless she either committed herself to involvement with a program of services or made a decision to terminate her parental rights. Visitation arrangements were not begun in the course of the foster care which commenced in November 1985. Appellant's next contact with the children occurred on August 13, 1986, 10 months after the children were removed from her home.

The record indicates that a hearing on appellant's termination petition was conducted late in January 1986. At least through the date of the hearing, appellant maintained her request for termination of her rights. She explained, regarding D.F.B., that she could not control the child, and she expressed fear for the child because of threats made by a man she knew. A letter brief submitted to the trial court suggests that termination was adjudicated as to D.F.B. on January 27, 1986, and as to M.A.B. on February 19, 1986. This brief also states that the termination orders were vacated on the basis of a stipulation of the parties concluded on May 29, 1986. There is no evidence of services given or contacts made by public agency staff with appellant between January 27 and July 31, 1986.

According to the briefs of the parties, the public welfare agency petitioned for termination of appellant's rights on July 9, 1986. On July 31, 1986, based on a stipulation of the parties, the termination petition was dismissed and it was agreed that physical custody of the children would be returned to Tammy B. after a six-week period of visitation contacts between the mother and the children.

On September 4, 1986, after appellant had approximately nine visitation contacts with the children over a period of three weeks, she phoned an agency staff worker to say that she was not ready to have her children returned. The worker reported to the court that appellant was unable to give her reasons for this decision, and had said she did not know when she would be ready to take them.

At trial, the petitioner's case first included testimony of a child psychologist who described the adverse effects of long-term foster care, which the witness described as care for more than three months. The expert testified:

But what happens to the child is that they don't really belong and that is detrimental to children in that they have someone who cares but are still not theirs. That is critical to a sense of formation of identity. My child needs to know who is there, who loves them, who they belong to, who they are like, who they are not like. The family is the way you set expectations and you train goals for children. And if you don't belong those goals are really for the people who belong in that family. You can attempt to attach but it is still not your mom and not your dad. There is a much higher incident of abuse that happens to children who don't belong. So you have difficulty with identity formation, you have difficulty with self-concept. If I don't belong, then what am I worth. You have more vulnerability to problems that can be connected with low self-esteem such as abuse. There is kind of a stress attached to not belonging or not having a place that is your own. Kind of like the feeling you would have if you were traveling every night and had to have a different place you didn't really belong any place. When children have that you will sometimes see delays in different parts of their development, in cognizant development, social skills, in emotional development and on rare occasions you will see effects on physical development.

\* \* \* \* \* \*

If you have—don't have loving parents it affects the emotional growth and it is very difficult to substantiate that because the scars are on the inside. They are not visible. You can't take pictures of them, but it affects the way kids are able to attach to people. If you have a child who is moved routinely from a bunch of situations it is almost like a piece of tape that after awhile doesn't stick very well and you need to be able to stick and attach to form good emotional development. That is a sense of basic trust and foundation of personality, that is not in disrupted children. And then you don't have a consistency in caretaking, the child doesn't develop a sense of basic trust and it is hard for them to move out and feel confident and to explore and expand their boundaries.

Petitioner, a social worker, and two of her colleagues, testified as to their contacts with appellant and her sons. A social worker whose employment with the public agency began on August 4, 1986, described the visitation contacts of the mother and the children beginning on August 13. The other two social workers testified regarding contacts in the case between January and November 1985. They reported on appellant's visitations, contacts with a counselor, her attendance at parent education classes, and her contacts with social workers and an in-home aide. Appellant missed many possible visitations, but she took advantage of many other occasions for visits. She missed some appointments with a counselor and attended only a couple of parent education classes. A social worker testified that stress and instability in appellant's life related to her dependency on relationships with men. Appellant has had a series of jobs since early in 1985, and she has been given some public assistance to cover special needs; she wishes to support herself without public assistance.

According to petitioner, appellant called in September 1986 to say that she could not take the children. Commenting on this conversation in a later meeting with appellant, petitioner testified:

Tammy again has stated that she is not ready to have the children back and in a meeting a long discussion between Tammy and I she was questioned on when she would be ready. She will not give a date on when she'll be ready to provide for her children. When I asked her if she attended counseling to alleviate the stress in her home she stated that, "After the court hearing in July I went to Mavis Moret on one occasion." When I asked her if it would be necessary to seek counseling in the future to alleviate the problems she told me that she didn't know. When I asked her, you know, why she didn't attend counseling she told me that was none of my business. When I asked her what needs to change in her life to better—for her to better be able to provide for her children or what the Welfare Department needs to do for her to change she said she doesn't know or she stated that was none of my business. So it doesn't seem to be an end in sight of how long these children will remain in a nonpermanent environment.

Jane Herrera, Tammy B.'s sister, testified on her behalf, as did Dean Dworshak, a friend who Tammy B. lived with during much of 1985. Both witnesses indicated Tammy B. was an affectionate parent who always took care of her children. Tammy B. testified that she loved her children and wanted them back. She reported that she could not take the children at the time of the trial in early November 1986 because she had no housing. She also testified that she was pregnant and expected to give birth to the child.

## ISSUE

Does the evidence sustain the trial court's finding of grounds for termination of appellant's parental rights?

## ANALYSIS

### 1. Standards.

■ Appellant challenges the sufficiency of evidence for the trial court's decision to terminate her parental rights. Because of the statutory preference to reunite parents and their children, the appellate courts exercise great caution in consid-

ering the sufficiency of evidence in a termination case, and give .only "some" deference to the trial court's decision. *In re Welfare of M.G.*, 407 N.W.2d 118, 121 (Minn.Ct.App.1987); *see In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn.1980); *In re Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980). In addition, we must be mindful that cause for termination must be shown by clear and convincing evidence. *In re Welfare of Rosenbloom*, 266 N.W.2d 888, 889–90 (Minn.1978). The appellate courts demand clear and specific trial court findings on the statutory grounds for termination. *In re Welfare of R.M.M.*, 316 N.W.2d 538, 540–41 (Minn.1982).

■ Evidence must show one or more of the statutory grounds for termination. *Id.* at 541; *see* Minn.Stat. § 260.221 (1986). The reasons for termination must be grave and weighty. *In re Welfare of H.G.B.*, 306 N.W.2d 821, 825 (Minn.1981). In addition to the statutory grounds, the petitioner must show that conditions justifying termination exist at the time of trial and will continue to exist for an indeterminate period. *Chosa*, 290 N.W.2d at 769.

■ Where proof of grounds for termination shows a long-term foster care placement and a repeated failure of efforts to reunite the family, the best interests of the children should be a "paramount consideration" in the trial court's decision. *In re Welfare of J.J.B.*, 390 N.W.2d 274, 279–80 (Minn.1986). The best interest standard requires balancing the children's leave interests in preserving the parent-child relationship, interests shared by the children's parents, against any competing interests of the children, such as the interest for a permanent placement. *M.G.*, 407 N.W.2d at 121.

2. Permanency of conditions of neglect.

Appellant disputes the gravity of the cause for termination in this case. She contends particularly that there is an absence of evidence showing the permanency of conditions cited by the trial court.

The trial court found three grounds for termination, under Minn.Stat. § 260.-221(b)(2), (5), and (7). Subsection (2) deals with substantial and continuous neglect of parenting duties, and subsection (5) speaks of the failure of public efforts to correct conditions that led earlier to adjudication of dependency. As to these grounds, and several others, "it must appear that the present conditions of neglect will continue for a prolonged, indeterminate period." *Chosa*, 290 N.W.2d at 769.

Subsection (7), dealing with children who are "neglected and in foster care," calls for consideration of numerous factors. *See M.G.*, 407 N.W.2d at 123. Among these factors is one stated in Minn.Stat. § 260.-155, subd. 7(6):

> Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time; * * *

This standard, like the supreme court's rule in *Chosa*, calls for proof of a condition which is of indeterminate duration.

The trial court made no findings of fact on the permanency of conditions it observed. There are no findings regarding the feasibility of additional services or the likelihood that these services would produce changes in a predictable period of time. It is evident, however, that the trial court has considered the statutory standards, and we find evidence sufficient to show that the conditions cited by the trial court are of a substantially permanent kind.

■ Evidence shows that appellant received numerous services between January and November 1985, and that she was offered the opportunity to be involved in a further service program when the children were placed in foster care on November 14, 1985. Despite the services given, appellant decided late in 1985 that she was still unable to provide parental care for her children.

Rejecting the proposal for further services, appellant elected in November 1985 to pursue termination of her parental rights. It is evident that she wavered in her resolve to take that course of action. The trial court and public welfare officials per-

mitted her to reconsider her decision and to make an attempt to care for the children. They stated again their willingness to provide services for her. Nevertheless, in September 1986, appellant remained unwilling to take custody of the children or to discuss the changes that might be made so that she could provide for the children's needs. She could not say when she might be ready to take the children. The social worker who discussed the case with appellant in September 1986 concluded that there did not seem to be "an end in sight of how long these children will remain in a nonpermanent environment."

Appellant testified that she needed more than six weeks time after July 31, 1986, to prepare for taking custody of the children. This evidence had to be assessed with reference to appellant's lack of resolve for nearly two years to assume responsibility for the care of her children. In addition, there was no evidence indicating any plan or hope of appellant suggesting when she might feel ready to take custody of the children. There is sufficient evidence to judge that the passing of still more time and the provision of further services would not have produced a change of appellant's circumstances in the foreseeable future.

When examining the permanency of appellant's circumstances, with a view toward taking reasonable steps to reunite her with her children, the trial court was also bound to take into account the best interests of the children. *J.J.B.*, 390 N.W.2d at 280 (consideration of best interests where there has been long-term foster care and repeated failure of efforts to reunite the family).

Here the children have been in foster care since November 1985. D.F.B. had two different foster care placements over an earlier period of eight months. M.A.B. has had no occasion to form a bonded relationship with his mother, and any relationship D.F.B. had with his mother has been badly interrupted. Further efforts to involve appellant in the lives of the two children pose the danger of interfering with the permanence of the children's family life, as specifically testified to by an expert witness.

The petitioner, a social worker, observed that even in the few months after the trial in November 1986 there could be grave consequences for the children in having the stability of their life interrupted by visitation contacts with their mother. Appellant contends that there is inadequate evidence the children were harmed before the time of trial through the course of events since they had been placed in foster care. The lack of specific evidence of harm takes little from the weight of the evidence as to the potential danger in permitting the mother more time to adjust her circumstances.

■ We observe that the trial court made no findings on the best interests of the children. This omission overlooks the clearly recognized public policy to protect permanent relationships for the children. *See J.J.B.*, 390 N.W.2d at 279. Still, we find abundant evidence of record to demonstrate that the trial court's decision to terminate coincides with evidence on the children's best interest.

An evaluation of the evidence in this case has been impaired by the total absence of any evidence on events occurring between late January and late July 1986. In addition, assessment of the various equities in the case has been marred by the failure to schedule visitation between November 14, 1985 and August 13, 1986. *See In re Welfare of M.A.*, 408 N.W.2d 227, 236 (Minn.Ct. App.1987), *rev. den* Sept. 18, 1987 (reasonable efforts to reunite a family are crippled by a prior decision to suspend visitation contact). We appreciate here, however, that the absence of visitation contact, and the absence of significant evidence on events early in 1986, are attributable to the unusual circumstance that appellant was continuously entertaining the notion to voluntarily terminate her parental rights.

### 3. Evidence of neglect.

■ The trial court found that appellant had continuously neglected to comply with parental duties and that the children remain neglected and in foster care. Appellant contends there is no evidence that she hurt the children or failed to properly care for them when they were with her. It is

true, as appellant suggests, that there is little evidence here that appellant has deficiencies in her parenting skills which would be detrimental to the children if they were with her. However, appellant's circumstances are at least equally as problematic, and probably of greater concern than her parenting skills. Throughout the course of two years, she has shown a repeated inclination to abandon entirely her effort to care for the children. This evidence is sufficient to support the trial court's findings under Minn.Stat. § 260.221(b)(2) and (7).

Similarly, appellant contends there is no evidence of uncorrected conditions that would be detrimental to the children if they were returned to their mother. Thus, she contends there is inadequate evidence to justify termination under Minn.Stat. § 260.-221(b)(5) (the failure of reasonable efforts to correct conditions leading to an adjudication of dependency). Here again, appellant merely fails to identify the condition which has not been corrected: her repeated unwillingness, over a course of two years, to assume responsibility for care of her children.

#### 4. Guardian ad litem.

 We note appellant's assertion that a guardian ad litem for the children failed to produce significant evidence on the termination issue. Appellant's argument suggests a reason for serious concern about the role of the guardian ad litem in the case. The guardian was appointed on September 15, 1986, shortly after the termination petition was filed. Her testimony includes no reference to her qualifications. She testified that she never saw the children and had only met the mother as a result of participation on a review team that discussed the case in July 1985.

The appropriate role for a guardian ad litem has been determined in Minnesota:

> To be effective in [participation in court proceedings], the guardian ad litem must become actively involved in the issues and actions which affect the child both before, during, and after actual court hearings. The primary duties of a guardian ad litem include case investigation, participation in negotiations and hearings, development of dispositional recommendations, presentation of recommendations to the court, regular contact with the child, protection of the child's rights, participation in decision making meetings that affect the child, case monitoring, advocacy on behalf of the child to ensure their needs are met, and compliance with all statutory requirements pertinent to the matter to which he or she has been appointed. The guardian ad litem, whose only focus is on the child's best interests, may also be in a unique position to facilitate the resolution of cases without litigation.

Minnesota Judges Association, *Guidelines for Guardian Ad Litem*, June 1986, at 23. The guardian's activity in this case falls far short of the prevalent standard. We do not agree, however, that this factor requires reversal where the trial court's decision was supported by convincing evidence.

#### DECISION

The evidence is sufficient to support the trial court's termination of appellant's parental rights.

Affirmed.