**In re the Matter of the WELFARE OF S.N. and M.O., Children.**

No. C1–87–1522.

Court of Appeals of Minnesota.

April 26, 1988.

Philip Richardson, Richardson & Richardson, Austin, for appellant.

Nancy A. Evans, Mower Co. Atty., Theresa M. Johnson, Asst. Co. Atty., Austin, for respondent.

Fred W. Wellmann, Hoversten, Strom, Johnson & Rysavy, Austin, for children.

Heard, considered and decided by KALITOWSKI, P.J., and RANDALL and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Appellant questions the 1987 termination of her legal rights as to her two sons, ages 11 and 9.

## FACTS

### 1. General

When Bertha O.'s family moved to Austin, Minnesota during the summer of 1980, she was a 43–year–old divorced parent of four. Appellant's four children were Monty, age two, who was born to a just dissolved marriage; Shannon, age five, who was born before the couple married; Patrick, age 15, a son by a prior marriage (1964–1972); and Michael, age 14, Patrick's sibling, an emotionally disturbed, retarded child who lived in a residential training center in the late 1970's and again beginning in 1983, but who moved back in with appellant in June 1986.

### 2. Homemaking abilities

In December 1984, an emergency arose due to filth in the home. A dependency petition citing the filth situation was filed on December 14, and based on reports citing the condition of the house, the children were removed on December 21. Later, appellant testified that her housekeeping efforts had failed due to pain medication she was taking connected with a 1981 knee injury and problems of arthritis and tendonitis. A Mower County social worker's report confirmed that Bertha O. had a serious problem with her leg.

With staff of the Woodvale program supervising appellant's housekeeping efforts, the hygiene problem in the home was corrected in early 1985, and she was doing "very well" in following her cleaning schedule in June 1985. As to Bertha's other homemaking abilities, there was evidence that she had severe financial problems early in 1985. In the summer of 1985, she rented a less expensive apartment and began working at a sheltered workshop. She continued to have financial problems late in 1985, although they were somewhat less serious.

### 3. Foster care

In October 1984, appellant's son Patrick, then age 19, committed a sexual contact offense against Shannon, then age 9. Patrick was convicted of that offense in April 1985. During the following two months, before Patrick was prosecuted, a social worker had contacts with the family to encourage steps to help Shannon and to avoid any repetition of the problem. Immediately after Shannon and Monty were placed in a foster home, it was discovered that Shannon was having emotional problems related to sex abuse by Patrick. Both Monty and Shannon displayed sexual manifestations in the beginning of their foster care. These manifestations were the result of abuse by Patrick, according to Dr. Milliner, who had examined the children in early 1985. Bertha O. has repeatedly expressed doubt about some of Shannon's accusations of abuse, but she has acknowledged that Patrick had been fondling Shannon's genitals, which was the subject of the criminal accusation, and that he had attempted to engage Shannon in oral intercourse. During the criminal prosecution, Patrick evidently admitted other wrongful conduct Shannon had said occurred.

Based on the advice of a doctor who examined the boys, and a finding that their adjustment seemed to be disturbed by visitations, visitation contacts were stopped by public welfare authorities in the spring of 1985.[1]

---

1. Subsequent visitation has never been permitted. A June 1985 order in the dependency proceedings permitted one visit and that was aborted when a worker accompanying the children

### 4. Adjudication of dependency

In April 1985, the trial court adjudicated dependency of both younger children because appellant "disbelieve[d] the statements of [Shannon] with respect to the abuse" and did not agree with the extent of counseling recommended for the boys. The court did not refer to the allegations of filth in the home.

In June 1985, a disposition was made requiring only that appellant complete a vocational rehabilitation assessment and a planned evaluation by a Mayo Clinic physician. She began workshop employment in July and met with the physician in October.

### 5. Social history

Social reports filed with the court in the dependency proceedings documented Bertha O.'s family history. Following is a summary of this history.

When she was a teenager and prior to her first marriage in 1957, Bertha O. surrendered a child shortly after it was born. She had three children in her first marriage between 1958 and 1962. She was severely abused by her husband and the marriage was dissolved in 1963. At the same time, she was hospitalized for treatment of a diagnosed mental illness and concurrently, her parental rights to the three children were terminated. Physicians who examined appellant in 1981 and 1985 attest that she did not have a psychiatric illness in 1963 but that the 1963 diagnosis would have been consistent with the state of the science at that time.

Steven, a Down's Syndrome sibling of Patrick and Michael, was in foster care beginning in 1978 when he was seven, and parental rights were terminated in Iowa in 1983, based on a conclusion his mother could not provide care for him.

While in Iowa between 1964 and 1980, Bertha O. received homemaker services on five occasions for unspecified concerns regarding child care, housekeeping, instability in the home, and financial difficulties.

In 1981, Minnesota assisted Iowa authorities in connection with Iowa proceedings on the welfare of Steven. Services were arranged to give training to appellant in parenting and housekeeping. Because housecleaning was a particular problem in November 1981 when Bertha O. had surgery for her knee problems, she received homemaker services.

In 1983, appellant received further child care assistance to deal with Steven and Michael's special problems. In 1983, Michael, then age 17, was returned to a care facility. Three years later, Bertha O. again began providing care for Michael at home. There is no record on appellant's parental relationship with Michael since June 1986.

In February 1984, Bertha's landlord complained of her housekeeping but the matter was handled informally.

### 6. Termination action

In January 1986, based primarily on a report of the Mayo Clinic physician, Dr. Alan J. Cunnien, who interviewed Bertha, a petition for termination of her parental rights was filed. The physician read a social history prepared by county social workers, interviewed Bertha for 90 minutes on October 4, 1985, and concluded that some of her traits were unchangeable. The termination case was tried on June 30, July 1 and July 2, 1986. The court heard testimony on events of 1984 and 1985 and took judicial notice of both dependency files and the court file regarding the welfare of Michael.

Appellant testified that she believed Patrick had abused Shannon, but that she believed Shannon had exaggerated on the subject. She said her belief was prompted in part by Shannon's accusation, which Bertha denied, that she had acted inappropriately with Monty. She acknowledged saying initially that Patrick's actions were not criminal, but explained that at the time of her denial, she did not personally observe abuse, nor did the children tell her they were being abused. She also said she was confused about the reference to criminal

observed that Patrick had not left the home by the time Monty and Shannon arrived. Motions for visitation since this occasion have been denied.

wrong because Patrick had not been arrested and jailed in the months following discovery of the offense.

The court received Dr. Cunnien's November report and his deposition, indicating that Bertha said in October 1985 that she was not personally at fault regarding the sexual abuse in the family; that the children were afraid to return home because they knew they had told some lies about the problem; and that the children preferred to stay in foster care because they enjoyed the favors they received. The doctor reported she also said that the approaches of a social worker and therapist had prompted Shannon to exaggerate the abuse problem.

Dr. Cunnien concluded that Bertha O. had no psychiatric illness, confirming an earlier, evidently thorough, psychological examination in 1981. There were no elevated scales on her personality survey. Her responses to the abuse of the children, he said, manifested a personality "disorder" with traits of

> an exaggerated sense of self-importance, lack of apparent receptiveness to criticism, entitlement (the expectation of special treatment without willingness to assume reciprocal responsibilities), exploitativeness in interpersonal relationships, lack of true empathy for the feelings of others, a history of promiscuity as a young woman, inability to maintain consistent working behavior, lack of consistent ability to function as a responsible parent regarding standards of hygiene and financial management, resistance to normal societal demands for adequate performance in home and occupational functioning, and apparent stubbornness or intentional inefficiency about matters which seem to be under her volitional control.

Dr. Cunnien also identified "psychological defense mechanisms" which prompted appellant to blame others for her predicament. He declined to form an opinion whether Bertha O. was capable of consistently appropriate parenting and housekeeping. Those are issues, he said, which "are best left to the direct observation of yourselves and others."

Because Bertha was neither ill nor motivated, Dr. Cunnien said that psychotherapy was not appropriate for her. His report recommended "behaviorial means to deal with her difficulties" and that she "be merely required to meet some minimum standard of care for a certain period of time before any consideration could be given to returning her children to her home." The report added a conclusion not otherwise explained that Bertha's "psychological" condition appeared unchangeable.

One year after the trial ended, the trial court filed its conclusions that appellant's parental rights should be terminated.[2] According to opinions stated in the trial court's 1987 order, termination was justified under Minn.Stat. §§ 260.221(b)(4), (5), and (7). As to (b)(4), the court concluded that Bertha O. is "palpably unfit to be a party to the parent child relationship because specific conditions exist" which relate to her relationship with her children which are detrimental to their physical and mental health. As to (b)(5), the court concluded that the conditions leading to the determination of dependency have not been corrected despite reasonable efforts under the court's supervision. Finally, as to (b)(7), the court concluded that the children are neglected and in foster care, which under section 260.015, subd. 18(c) involves the primary factor of failure of the parent to make reasonable efforts to adjust circumstances after placement of a child in foster care.

Just as in the dependency proceedings, the trial court's findings did not address Bertha O.'s housekeeping failures. As to her previously found failures to respond appropriately to the abuse of the young children, which was the primary reason for the dependency order, the court found Bertha O. discounted the seriousness of the situation and the children's need for coun-

---

2. Under Rule 59.06 of the Juvenile Court Rules, the court was required to file its order on July 17, 1986. Instead, the order was issued on July 9, 1987, and the record gives no explanation for this loss of a year in dealing with the serious issues of this case.

seling. Specifically, the court found in October 1985 that when she was interviewed by a doctor she continued to deny that sexual abuse had occurred and continued to accuse her younger children and therapist and social workers of lying about the abuse. The court also found that she had an "attitude" of "confrontation" with various people who worked with the children (teachers, foster parents, social service personnel); and an "attitude" towards them "of a belief that the children do not have any emotional, mental, intellectual or physical problems."

The court also found that nothing further could be done to enable the return of the children and that termination of parental rights would give them the permanent placement in a stable home which they need. Bertha O. questions the evidentiary support for these findings on appeal.

On the appeal from the judgment we are called upon to decide if these findings can be sustained and if the court's findings support its opinion that statutory grounds exist for termination of appellant's parental rights. *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976).

### ISSUES

1. Do trial court factual findings which are sustained by the evidence support the court's opinion that there are grounds for termination under 260.221(b)(4) (unfitness), (5) (uncorrected conditions), (7) (neglected and in foster care)?

2. Can termination rest solely on findings and evidence regarding the best interests of the children?

### ANALYSIS

We conclude the proceedings must be remanded for a new trial. Giving due attention to the standards of review which govern the case, we can find clear and convincing evidence supporting findings that the children need a permanent placement and that there are serious barriers to reuniting them with their mother. Neither the evidence nor the trial court's findings, however, adequately address statutory standards on termination and the interests of the parent and children that are protected by those standards. The record naturally induces speculation of facts that would support the decision of the trial court, but we are confined on review to the record actually developed.

The standards of review in termination cases are well-settled:

1. Standards emanate from the statutory preference to reunite the parent and the child whenever possible.

2. Great appellate court caution is to be exercised in reviewing these cases, and only some deference given to the trial court's findings.

3. The trial court's decision must be supported by clear and specific findings.

4. We must be mindful of the petitioner's burden to prove its allegations by clear and convincing evidence.

5. The trial court must find that one or more conditions enumerated in the statute support termination. In addition, (a) termination is not to be chosen except for grave and weighty reasons, and (b) conditions of concern must continue to exist at the time of the hearing and it must appear they will continue for a prolonged indeterminate period, and (c) where there is a record of long-term foster care, characterized by continuous failures in reasonable efforts to reunite the child and parent, the child's best interests are a paramount consideration in the case. *See In re Welfare of M.G.*, 407 N.W.2d 118, 120–21 (Minn.Ct. App.1987) (citing pertinent decisions of the Minnesota Supreme Court).

I. Grounds for termination.

   A. Minn.Stat. § 260.221(b)(5) (uncorrected conditions).

      ■ The court may terminate the rights of a parent to a child if it finds that "following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination." Minn.Stat. § 260.221(b)(5) (1986).

As to the conditions leading to the adjudication of dependency, the court identified

only Bertha O.'s unsatisfactory coping with sexual abuse in her family. Neither the court's findings nor the evidence presented demonstrate that the mother's response is unsatisfactory such that the children cannot live with her now or ever. The record shows in fact that discovery of the sex abuse problem and dealings with the mother on that topic did not prompt removal of the children from the home at any time during the fall of 1984 after the abuse was initially discovered.

The trial court's findings on the mother's response give a scant picture of the fault charged to her, stating only that on one occasion in October 1985 she denied problems, and that she has had a faulty "attitude" on the existence of her childrens' problems with others. The basis for the general finding on appellant's attitude is not clarified by evidence in the case. The court also made a general finding that nothing could be done to produce "lasting parental adjustments" to permit return of the children. No evidence supports a more specific finding that she was permanently unable to cope with the abuse which occurred in the family.

The deference we will accord to a court opinion inadequately supported by findings is further diminished by reference to findings contradicted or unsupported by the evidence.

First, the court erroneously found that the doctor was told Bertha O. denied sexual abuse had occurred. The doctor did not so report and there is no evidence that she denied the occurrence of any sexual abuse.

In fact, references in the record to appellant's lasting disbelief of some descriptions of Patrick's abuse is nonspecific such that there is no clear showing of the degree of this fault. Dr. Cunnien reported that appellant admitted Patrick's abuse of Shannon, but that she believed the abuse was confined to fondling of genitals and attempted oral intercourse. She knew Patrick admitted other things and thought that this was due to his effort after being convicted to get a lighter sentence. Dr. Cunnien, whose report is the sole source of petitioner's evidence on appellant's state of

mind after the dependency adjudication, did not reveal what appellant denied, and stated only that she did not "appreciate" or "objectively perceive" the seriousness of the prior incidents. Thus, Cunnien called only for strict supervision of Bertha O.'s future custodial care of her younger sons.

The dependency trial court found Bertha O. did not recognize a need for counseling prior to the adjudication of dependency, but there is no evidence of any such denial following the adjudication of dependency. A social worker's report indicates that in September 1984, Bertha O. acknowledged that Patrick abused Shannon, and she discussed pursuing help for Patrick and Shannon. Bertha O. disputed the motives and the methods of one therapist and the social worker, but the record does not permit reading this as a denial of all need for counseling. There is scant showing that appellant was unable to cope with sex abuse in the family or that the condition is so grave as to prevent any further contact.

B. Reasonable efforts to correct conditions.

Minn.Stat. § 260.221(b)(5) also requires an assessment of the reasonableness of efforts to deal with the condition after adjudication occurs. The trial court found only (1) that the mother was evaluated, (2) that there had been one aborted visit, and (3) that the dependency trial court had found appellant made reasonable efforts between April and June 1985.

Appellant contends her efforts were inadequate only because there was no plan for reuniting the mother and the children. The record shows a single formal plan which called for counseling of the mother "as required" and services to her "as required." The trial court acknowledged that there was no plan other than the dispositional order in the dependency proceedings—and that order called only for Bertha O.'s cooperation in an evaluation and a vocational rehabilitation assessment. She did so cooperate.

There is further evidence there was no plan at all—the social report in the dependency case recommended only a job search

and the Woodvale housekeeping program, and a supervising social worker wrote in a letter that he couldn't think of something else to do in the case.

The petitioner's case on reasonable efforts is defensible, if at all, by the trial court's observation that reasonable efforts in some cases might be no efforts at all. The court found that due to a personality "disorder," the characterization of appellant's traits identified by Dr. Cunnien, there was no prospect for reuniting. This finding must be independently reviewed because Dr. Cunnien's testimony is entirely in a written report and deposition. *See Northern States Power Co. v. Williams,* 343 N.W.2d 627, 630 (Minn.1984). These documents do not show clear and convincing evidence that no services could be devised and employed to assist Bertha to deal better with abuse in her family.

Dr. Cunnien concluded Bertha O. had no psychiatric illness and did not need or want therapy. He found instead personality characteristics involving denial and other traits which he evidently felt were unchangeable. He specifically disclaimed suggesting that her traits made her incapable of parenting or housekeeping. In addition, he specifically recommended that behavioral means, i.e., setting goals to assess her behavior, be used to deal with her traits. Thus, while there is evidence some facets of her condition are permanent, the letter does not suggest that any particular behavior is chronic or unalterable or that her inability to cope with sexual abuse in her family is chronic or unalterable. The 1981 report also thoroughly studied her personality and said that she was not unable to be a parent and also said behavioral help was appropriate.

In addition, the court found that Dr. Milliner, a child psychologist who interviewed the children, was of the opinion that the mother did not have the capacity to acquire appropriate parenting skills. This finding is not specific as to the particular problem which is the subject of the proceedings—appellant's inability to cope with the abuse situation. Moreover, Dr. Milliner never saw Bertha O. He based this observation on "secondhand reports" from others.

Finally, the court found that there were some problems early on with some visits but there is no evidence and no finding that, given the chance, the parent and children could not have been helped in their interaction and in improvement of their ability to deal with the sex abuse problem.

C. Minn.Stat. § 260.221(b)(7) (neglected and in foster care).

■ The next issue is whether Bertha O. made appropriate efforts to permit reuniting, an essential facet of the statutory concept of "neglected and in foster care." *See* Minn.Stat. § 260.015, subd. 18(c). The termination court did not state that Bertha O.'s efforts were inadequate due to a housekeeping problem. The court made no specific finding that she had failed to make reasonable efforts. Several conditions might bear on the court's opinion that her efforts were inadequate.

First, the court found, as already indicated, that there was some evidence of Bertha's inappropriate response to the sex abuse. This response was most evident after the children were placed in foster care and in the early months of 1985. As indicated in the analysis above, findings and evidence of record do not indicate the gravity of this problem.

Next, the court found that the mother "permitted the children to have contact" with Patrick during the last two visitations, a finding which implies misconduct of the mother bearing on the reuniting effort. In one episode she didn't have Patrick leave by the time the boys arrived for visitation and the boys saw Patrick as they were taken away from the home. The second contact was a chance meeting in public. There is no finding or evidence that the mother's conduct in this regard or Patrick's presence generally is uncontrollable. Nor is it evident that the two episodes discussed were sufficiently grave to call for termination of parental rights.

The court also found that "[i]nappropriate behavior by the children increased in frequency after visitations with their moth-

er"—possibly suggesting mistakes on her part. The court did not specify what she may have done wrong, nor demonstrate that the gravity of the situation is such as to call for termination of parental rights.

The court found that appellant has shown only "minimal interest or concern in the children since their placement in foster care" and that her interest was specifically aroused before court proceedings. There is no finding or evidence suggesting that Bertha O.'s neglect impaired any contact or any reuniting possibilities with the children. In fact, appellant was denied visitation contacts, was later denied permission for telephone calls to the boys, and told that the boys were upset by her telephone calls. There were no plans or steps whatsoever for reuniting such that her interference could be asserted or proven.

The statute also requires consideration of reasonable efforts to reunite. *See* Minn. Stat. § 260.221(b)(7); 260.155, subd. 7(5). The topic of efforts aimed at correction of dependency conditions has already been discussed. Reuniting efforts were substantially nonexistent. The record supports the finding that early visitations were harmful, but not that all reuniting efforts, such as having a therapist present during contacts, or instituting behavioral approaches which might improve the mother's efforts to deal with the children, would be harmful.

D. Minn.Stat. § 260.221(b)(4) (unfitness).

■ A court may terminate a parent's rights as to her children if she is

palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child.

Minn.Stat. § 260.221(b)(4) (1986). The trial court's finding 19 states: "[B]ecause of her mixed personality disorder, it is the Court's belief that additional services would not bring about lasting parental adjustments in her to enable a return of the children to her care." This finding is based on Dr. Cunnien's report in which he specifically says he is not dealing with parenting and not dealing with any particular manifestation of Bertha O.'s personality.

The court's social history is not specific as to any parenting disability other than periodic housekeeping problems which the court has not identified as a permanent problem. The court made no finding as to the severity of any specific parenting disability and no finding that there are any parenting disabilities that are gravely threatening to the children.

With specific reference to the findings, the court found that Bertha O. "has exhibited a pattern during the last 25 years of an inability to care for her natural children starting with the birth of a daughter who was placed for adoption." Bertha O.'s surrender of a child as a teenager is not evidence of a specific condition regarding her inability to care for two children born when she was 38 and 41.

There are no specific findings or evidence indicating the severity of any shortcomings or "inability" of Bertha O. in the past; and in fact there is undisputed evidence that she was wrongfully diagnosed, hospitalized, and badly victimized in 1963. There is no finding that any historic conditions still exist or threaten the welfare of these children.

Michael and Steven both have special disabilities not pertinent to appellant's parenting of the two children in this petition. In addition, the record indicates that Michael is back home and being cared for by his mother. The 1984 removal, discussed in the social history, was for filth, which has been corrected. As to whether it is a recurring threat, it is the only episode shown to be serious and threatening to the children.

The court found that it was the child psychologist's opinion that "the mother lacks either the emotional capacity or motivation to modify her previous patterns of neglect towards the children or to acquire appropriate parenting skills." This doctor

never saw Bertha O. and the statements are nonspecific as to any condition. The court's findings regarding unfitness were clearly erroneous and insufficient to justify termination of Bertha O.'s parental rights.

## II. Is best interest enough?

Under the best interests standard, the interest in preserving the parent-child relationship, which the child shares with the parents, must be balanced against any other competing interests of the child. *In re Welfare of J.J.B.*, 390 N.W.2d 274, 278–79 (Minn.1986); *M.G.*, 407 N.W.2d at 121. Other children's interests arise due to time and placement, the choices of the children and the health of the children. *Id.* Here, the court found that both children have resided in foster care since December 21, 1984,[3] and have prospered in foster care; and the court noted the need for the children's permanency. Further, the court found that the children do not wish to have visits, and that after 15 months of foster care, one or both of them refused mail and calls. Finally, the court found Shannon is quite hostile towards reuniting or even visitation with his mother. Those are vitally important best interest findings.[4]

■ The finding that it is in the best interest of the children to terminate Bertha O.'s parental rights do not alone justify the trial court's decision. There are numerous reasons for this conclusion. First, the court stated no opinion whether the best interests of the children is a substantial element in this case vis-a-vis termination. While the court recites the children's statements and the passage of time as factors in the case, there is no finding that these permanently preclude reuniting the family. Moreover, such a finding would not be adequately supported by the evidence now of record.

Second, the governing statute expressly requires a showing of clear and convincing evidence that a specific statutory ground for termination exists. Minn.Stat. § 260.221; *In re Welfare of Solomon*, 291 N.W.2d 364, 367 (Minn.1980). Thus, the legislature has made it evident that termination decisions cannot be made with disregard for standards on the conduct and condition of the parent. *J.J.B.* and other supreme court cases require a balancing of interests in preserving a parental relationship and the children's other interests. *See J.J.B.*, 390 N.W.2d at 278–79; *In Re Welfare of J.W.M.*, 290 N.W.2d 770, 772 (Minn. 1980); *Petition of Linehan*, 280 N.W.2d 29, 33 (Minn.1979).

Third, case law indicates that parental rights may not be terminated solely on the grounds that it is in the best interests of the child to do so. *J.W.M.*, 290 N.W.2d at 772. The child's best interests are a paramount factor, but it is not established that they can be the sole cause for termination. *See J.J.B.*, 390 N.W.2d at 278–79 (best interests can be one factor among others where there is adequate evidence and findings of other grounds); *M.G.*, 407 N.W.2d at 120–21.

Finally, termination based solely on the best interests standard conflicts with additional rules of law. Because the standard includes so prominently the factor of passing time, its singular use would lead to results prospectively shaped by delay and procrastination, in sharp conflict with statutes highlighting the significance of reasonable public service efforts to reunite the family, and equally in conflict with rules showing a judicial aim for expediting attention to proceedings involving intervention with the family.

The statutory findings are not adequately supported by the evidence; without those findings the best interest finding of

---

3. The three-year process here has enlarged this factor. This is wholly inappropriate under the rules and as a matter of public policy. We have currently considered the time issue and are cognizant that a need under the law for a new trial unavoidably increases the significance of a need to protect stable relationships of the children.

4. The court also recited one psychiatrist's view on the desirability of the children having no contact with their mother, the psychological trauma for the children in leaving foster care, and the need for continued therapy; but made no finding on the credibility of this testimony or on its weight vis-a-vis termination.

the court, although supported by the evidence, is insufficient to terminate appellant's parental rights.

## DECISION

The order terminating parental rights is reversed. A new trial is ordered in which the trial court and petitioner should expediently and with particularity evaluate the merits of this case pursuant to statutory standards.

Reversed and remanded.